724 F.2d 427
 77 A.L.R.Fed. 735, 1984 A.M.C. 937
 Daniel WHORTON and Leroy Whorton, d/b/a Whorton Brothers
Seafood Company, a partnership, Appellees,
v.
The HOME INSURANCE COMPANY, Appellant.
Daniel WHORTON and Leroy Whorton, d/b/a Whorton Brothers
Seafood Company, a partnership, Appellants,
v.
The HOME INSURANCE COMPANY, Appellee.
 No. 83-1339(L), 83-1401.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1983.
Decided Jan. 6, 1984.
 
 Mark T. Coberly, John M. Ryan, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant/cross-appellee.
 George H. Heilig, Jr., Norfolk, Va. (Mary G. Commander, Rixey, Heilig & McKenry, Norfolk, Va., on brief), for appellees/cross-appellants.
 Before WIDENER, SPROUSE and CHAPMAN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Defendant The Home Insurance Company appeals from the district court's judgment in favor of plaintiffs Daniel Whorton and Leroy Whorton, d/b/a Whorton Brothers Seafood Company. The judgment required Home Insurance to pay Whorton $225,000.00 insurance proceeds for the loss of the latter's boat as a result of its captain's act of barratry. The Whortons cross-appeal from the denial of their claim for prejudgment interest and attorneys' fees. The case was tried without a jury on depositions, exhibits, and briefs filed by both parties. Finding no error, we affirm.I
 
 
 2
 The Home Insurance Company issued a policy of hull insurance in the amount of $225,000.00 on the KATHERINE J, a fishing vessel owned by the Whortons. The policy covered the period from July 1, 1981 to July 1, 1982. It originally provided navigational limits restricting coverage to an area from Bangor, Maine to Hatteras, North Carolina, and extending no more than 200 miles offshore of the United States mainland. The parties agree that "barratry" was a covered peril under the policy.
 
 
 3
 Deposition testimony and exhibits showed that in September, 1981, Leroy Whorton requested that the navigational limits of the policy be extended to include Key West, Florida and the Gulf of Mexico, and the Company's authorized agent approved the request during the week of September 14, 1981. After receiving the Company's approval, the Whortons sent the KATHERINE J from Hampton, Virginia to Key West via Brunswick, Georgia. In Brunswick, the KATHERINE J was converted from a scallop boat to a shrimp boat by the addition of shrimping equipment. The KATHERINE J then continued down the coast towards Key West, harvesting shrimp along the way.
 
 
 4
 The vessel lost a propeller while shrimping and was towed to Key West by the Coast Guard. The boat docked at the Marquesas Shrimp Company (Marquesas) on October 5, 1981, and remained there for over a month while undergoing repairs. During the period the KATHERINE J remained at the Marquesas dock, the vessel's captain, John Broksch, made a number of unusual preparations for the KATHERINE J's next voyage. He bought 2,500 gallons of fuel and a two-months' supply of groceries with his own funds. The Whortons had instructed him not to purchase additional gasoline, and the normal way to purchase groceries was to draw on the Whortons' account with Marquesas. More sophisticated navigational equipment and radios were installed on the KATHERINE J without the Whortons' knowledge or consent. The vessel's cook, Earline Lynn, who had been aboard the boat since it had left Hampton, was paid $950.00 to get off the boat, again without the Whortons' knowledge or consent. Lynn said that at one point Broksch had spoken to her about making a "pot run" with the KATHERINE J.
 
 
 5
 The vessel sailed from Key West on or about November 8, 1981 with the captain and a crew of three, and shrimped for five days. Early on the morning of the sixth day, the captain ordered the crew to put the shrimp nets on deck, and announced that he was taking them "where the money is at." The KATHERINE J ran for five more days without shrimping. One of the crew members, Arthur Dunton, became concerned about this and asked Broksch where they were going. The captain told Dunton they were making a "pot run." When Dunton asked if the Whortons knew about the captain's plans, Broksch replied "No. It doesn't make a damn." In fact, there is no evidence in the record that the Whortons knew, when the KATHERINE J set out from Key West, about the captain's unusual activities, or that the boat was involved in anything other than a shrimp run.
 
 
 6
 On the tenth or eleventh day out of Key West, the three crew members were inspecting a broken generator in the hold when the KATHERINE J struck a reef and capsized. By the time the crew returned to the deck, the captain had disappeared--he apparently fell overboard. The crew abandoned ship in the life raft and remained afloat for eight days before being rescued and put ashore in Nicaragua. Neither the captain nor the KATHERINE J has been seen again.
 
 
 7
 Dale Wolfe was assigned by Home Insurance on January 6, 1982 to investigate the loss of the KATHERINE J. He interviewed Earline Lynn, the Whortons, and the owner of Marquesas and contacted the American Embassy in Nicaragua. He learned that Dunton was still in prison in Nicaragua and would not be released unless the United States agreed to take in his fellow crew member, an exiled Cuban, which it had so far refused to do.[1] He was unable to locate the third crew member, a Canadian. The insurance company denied coverage on April 9, 1982, and Wolfe closed his investigative file on April 14, 1982. The Whortons filed this action on October 1, 1982.
 
 
 8
 The district court concluded that the policy's navigational limits had been extended in September to include Key West and the Gulf of Mexico. It further found that an act of barratry by the captain had occurred at the dock in Key West, within the policy's navigational limits, and that the barratry proximately resulted in the vessel's loss. As the parties did not dispute that barratry was a covered peril under the policy, the court entered judgment in favor of the Whortons for the policy amount, $225,000.00. The court denied the Whortons' requests for prejudgment interest and attorneys' fees, however, on the grounds that Home Insurance had exercised due diligence in investigating the claim and had denied coverage in the good faith though mistaken belief that the loss of the vessel did not proximately result from a covered peril.
 
 II
 
 9
 Home Insurance contends that the district court's finding that an act of barratry occurred at the dock is not supported by the evidence. It argues that there is nothing in the record to suggest that the captain departed from Key West with the intention of engaging in a drug run; that it was only after he had been asea for at least five days--and after he had gone outside the policy's navigational limits--that any act of barratry occurred. The captain's preparations were not in themselves illegal, Home Insurance claims, and thus did not amount to barratry.
 
 
 10
 In National Union Fire Insurance Co. v. Republic of China, 254 F.2d 177, 183 (4th Cir.1958), we held,
 
 
 11
 "Barratry ... is a generic term which includes many acts of various kinds and degrees. It comprehends any unlawful, fraudulent or dishonest act of the master or mariners, and every violation of duty by them arising from gross and culpable negligence contrary to their duty to the owner of the vessel and which might work loss or injury to him in the course of the voyage insured...." (citation omitted)
 
 
 12
 See also Marcardier v. Chesapeake Insurance Co., 12 U.S. (8 Cranch) 39, 43, 3 L.Ed. 48 (1814).
 
 
 13
 In this case the trial court found a number of acts by the captain of the KATHERINE J in Key West to have been contrary to his duty to the owners of the vessel and to have been undertaken for some unlawful or fraudulent purpose resulting in a loss to the Whortons. The captain bought 2,500 gallons of fuel directly contrary to the Whortons' orders. He stocked the vessel with a two-month supply of groceries, and equipped the KATHERINE J with sophisticated navigational devices unnecessary for a twelve-to-fourteen-day shrimping run in the Gulf of Mexico. These extraordinary preparations, along with the cook's testimony that Broksch had mentioned a "pot run," readily support an inference that the captain intended something other than a shrimping expedition even before he left Key West. The vessel then sank making the illegal drug run to South America for which the captain had prepared while docked at the Marquesas dock at Key West.[2] The evidence amply supports the trial court's conclusion that barratry occurred at the Key West dock and that those activities proximately resulted in the loss. Having proven barratry occurring within the navigational limits of the policy, the Whortons were entitled to a judgment in the amount of the policy.[3]
 
 III
 
 14
 The trial court, moreover, did not abuse its discretion in denying prejudgment interest. As it noted in its memorandum order,
 
 
 15
 This is not, by far, a simple case. The insurance company was faced with the problem of the vessel having been lost in international waters and for a long period time of having no members of the crew available to interview. We find that the insurance company, faced with the obstacles it was, acted with all due diligence in this matter. It must be remembered that an insurance company owes a duty to all of its clients not to pay on invalid claims.
 
 
 16
 Whorton v. The Home Insurance Co., No. 82-308-N, mem. order, at 5-6 (E.D.Va. March 4, 1983). We see no reason to depart from our rule that "[t]he award of prejudgment interest in admiralty cases rests within the sound discretion of the district court." Ameejee Valleejee and Sons v. M/V Victoria U., 661 F.2d 310, 313 (4th Cir.1981).
 
 
 17
 We likewise affirm that part of the trial court's judgment rejecting the appellants' claim for attorneys' fees. There is no statutory right to attorneys' fees in suits at admiralty. In the absence of a statute or special agreement allowing recovery of attorneys' fees, a losing party may be assessed such fees only when it has acted in bad faith or for oppressive reasons. Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The court found that the Company denied the claim and defended this action in a good faith, reasonable belief that coverage was not due. We cannot say this was error.
 
 
 18
 Perceiving no error in the trial court's other findings, the judgment below is
 
 
 19
 AFFIRMED.
 
 
 
 [1]
 Dunton was released from the Nicaraguan prison in June, 1982, two months after the Company denied coverage on the policy
 
 
 [2]
 The parties devote considerable attention in their briefs to who bears the burden of proof on the issue of whether the "loss from a covered peril" occurred within the policy's navigational limits. Home Insurance contends that the Whortons did not meet their burden of proving that the KATHERINE J sank in waters lying within the policy's navigational limits. Because we here affirm the district court's finding that barratry occurred at the dock in Key West and that the barratry proximately caused the loss, we need not resolve the burden of proof issue. Even if, as Home Insurance contends, the insured party has the burden to show the "loss from a covered peril" occurred within navigational limits, we find the Whortons met that burden. The trial court determined that the policy's navigational limits had been extended to include Key West and that determination is amply supported by the record. The captain's barratrous acts occurred in Key West; Key West was within the extended limits. The actual "loss" of the KATHERINE J, whether it was within or without the extended limits, resulted from the barratry. Therefore, where the boat actually sank is irrelevant. See also footnote 3, infra
 
 
 [3]
 Home Insurance argues that the captain did not make the decision to take the KATHERINE J on a drug run until after the vessel was outside the policy's navigational limits. Even if we accepted this view of the evidence, we would be compelled to affirm the district court's judgment as to the company's liability. The very act by a ship's captain of taking the vessel beyond navigational limits known to the captain, against the owner's orders, in and of itself constitutes barratry. See United States Fire Ins. Co. v. Cavanaugh, 1983 A.M.C. 1261 (S.D.Fla.1982). The record is clear that Broksch did not have the Whorton's authorization to exceed navigational limits for the purpose of shrimping. Doing so, he breached his duty to the owners and committed barratry as this circuit has defined it