**DIASONICS, INC., Plaintiff**

v.

**Robert W. INGALLS, and National Plastics, Inc., Defendants.**

**Bankruptcy Nos. 89–9124, 88–00108.**

United States Bankruptcy Court,
N.D. Florida,
Gainesville Division.

Oct. 5, 1990.

James H. Post, and Raymond Magley, Jacksonville, Fla., for plaintiff.

W. Kirk Brown, Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came before the court August 2, 1990 on cross motions for summary judgment. The plaintiff, Diasonics, is an unsecured creditor of Synergetics ("Debtor"). The Debtor filed its Chapter 11 petition for bankruptcy on June 7, 1988. On October 16, 1989, Diasonics filed its complaint in this adversary proceeding seeking to have this court classify the claims of National Plastics ("Plastics") and Ingalls as capital contributions and not loans or in the alternative, to equitably

subordinate Plastics' and Ingalls' claims to the claims of other unsecured creditors. The defendants filed a motion for summary judgment and ask this court to determine that their advances to the Debtor were loans and should not be treated as capital contributions nor be equitably subordinated to the claims of other creditors. Having considered the arguments of counsel together with the memorandum of law filed in support of both motions, and for the reasons set forth below it is determined that both Plaintiff's and Defendants' motions for summary judgment with respect to equitable subordination are denied. However, Plaintiff's motion for summary judgment with respect to classification of the claims as capital contributions will be granted. Plastics' and Ingalls' claims are not debts incurred by the Debtor and therefore, they are not creditors of the Debtor and may not recover on a pro-rata basis with the unsecured creditors.

The Debtor in this case was founded in 1969. At that time it designed and manufactured medical instrumentation systems. Robert Ingalls first had contact with the Debtor in 1970, after he had placed an advertisement in Florida Trend Magazine stating that he was interested in investing in a promising business. Ronald Clark, the president of the Debtor, answered Ingalls' advertisement. Soon thereafter, Ingalls and his family contributed between $125,000 and $134,000 to the Debtor and became the corporation's largest shareholder, holding 48% of the Debtor's shares. Sometime after Ingalls became a shareholder, the Debtor engaged in the business of designing, manufacturing, marketing and servicing mobile medical units used for shared medical diagnostic and treatment services.

In 1975, the Debtor was reorganized and 100% of its stock was issued to Plastics, thus becoming a wholly owned subsidiary of Plastics. At the time of the reorganization Ingalls owned 83% of Plastics. Plastics did not pay Ingalls any consideration for his share of the stock in the Debtor. Clark received 19% of Plastics' stock in exchange for his stock in the Debtor. After the reorganization the business purpose of the Debtor was to research and develop the mobile health testing products. The Debtor, at the time of filing its petition in bankruptcy, was producing a mobile CT Scanner Unit, a mobile MRI unit, a mobile Cardiac Catherization Unit and a mobile Lithotripter Unit.

Since the 1975 business reorganization the Debtor has been controlled by Plastics. However, Plastics has been inactive since 1979 and its only purpose since then has been to receive funds from Ingalls and distribute those funds to the Debtor. Between 1975 and 1987 Ingalls advanced funds to the Debtor either directly or through Plastics on an as needed basis. These funds were used for the growth and expansion of the Debtor's business. Ingalls attempted to structure these advances as long term loans. In fact, they were stated as loans on the Debtor's tax returns. However, the Debtor delivered only six or seven promissory notes for these loans to Ingalls. The facts are disputed as to how many promissory notes were executed. However, the structure of the transaction is what is important not the number of notes executed. For the purposes of this summary judgment argument we will assume there were seven notes.

Five of the promissory notes were executed between 1975 and 1977. Since 1977 there have been two notes executed and both were executed on December 31, 1987. The first of the latter two notes was in the amount of $3,750,318 and was a consolidation of all advances made by Plastics to the Debtor from 1975 to 1987. The second note was in the amount of $545,000 and was a consolidation of all advances made by Ingalls to the Debtor during 1987. None of the seven notes contained repayment terms. Four of the notes were payable on demand and the remaining three had a maturity date. However, neither Plastics nor Ingalls has demanded repayment. There have been some payments on the notes but they have not been paid in an ordinary course of business. Additionally, the interest charged on the loans was nominal. The rate charged was a fixed annual sum but was determined arbitrarily and was not related to a particular rate of

interest. The loans have never been declared to be in default.

Ingalls filed a proof of claim in the amount of $588,738.98. This claim is primarily for cash advances made by Ingalls to the Debtor during 1987. Plastics filed a proof of claim in the amount of $3,846,739.55 which is for cash advances made by Plastics to the Debtor during the 15 years preceding the petition date. For most of Plastics' existence it has been inactive and has served merely as a shell corporation for Ingalls. Therefore, we will treat the advances made by Plastics and Ingalls singularly.

## EQUITABLE SUBORDINATION

It is the plaintiff's argument that Ingalls' and Plastics' claims should be subordinated to the claim of all other creditors under the doctrine of equitable subordination. Plaintiff argues that subordination is appropriate because the Debtor was undercapitalized when the advances were made and that they engaged in inequitable conduct which would justify such subordination. Contrarily, the defendants argue that the claim should not be equitably subordinated. They state that the conduct in which they engaged did not amount to inequitable conduct nor did it cause injury to other creditors or to the bankrupt.

■ Section 510(c)(1) of the Bankruptcy Code gives a court the authority to subordinate a claim under the principles of equitable subordination. The law is well settled as to the requirements that must be met before a court may exercise its power to subordinate a claim. First, the claimant must have engaged in some type of inequitable conduct. Second, the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. Finally, equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In the Matter of Mobile Steel*, 563 F.2d 692 (5th Cir.1977).[1] This standard was recently reaffirmed by the Eleventh Circuit in *Matter of Lemco Gypsum, Inc.*, 911 F.2d 1553 (11th Cir.1990). The implementation of the Bankruptcy Code, and with it § 510(c), makes the third part of the *Mobile Steel* test moot.

■ In cases where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated. *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986), *citing, In re Multiponics*, 622 F.2d 709, 714 (5th Cir.1980). Section 101(30)(B) of the Bankruptcy Code defines an insider as a director, officer, or person in control of the corporate debtor; a partnership in which the corporate debtor is a general partner; a general partner of the corporate debtor; or a relative of any such individuals. Ingalls was the chairman of the board of directors of the debtor, there is no dispute that he is an insider. Therefore, once the Plaintiff has presented material evidence of Ingalls' unfair conduct, Ingalls must prove the fairness of the transaction to avoid having his claim subordinated.

■ The plaintiff, however, argues that inequitable conduct is not a prerequisite to have a claim equitably subordinated. The plaintiff cites to *Matter of Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.1990) for support of its proposition. That court considered congressional statements and the legislative history and scheme of § 510(c) and determined that "equitable subordination no longer requires, in all circumstances, some inequitable conduct on the part of the creditor." To determine whether the claim should be subordinated the court focused on the nature of the claim. That case involved the subordination of a tax penalty claim. Numerous courts have found that claims for punitive damages or for penalty taxes are the types of claims that have been subordi-

---

**1.** The decisions of the Fifth Circuit existing on September 30, 1981 were held to be binding precedent on the courts in the Eleventh Circuit.

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

nated without a finding of inequitable conduct. See also *Schultz Broadway Inn v. United States*, 912 F.2d 230 (8th Cir.1990). These courts have found that subordination is appropriate without inequitable conduct when innocent creditors will be harmed because of prior conduct of the debtor. We agree that where a penalty tax or a claim for punitive damages is involved the claim may be subordinated without inequitable conduct. The defendants' claims, in this case, are for the payment of alleged loans, not for punitive damages. Their claims do not fall into the class of cases where inequitable conduct is not a necessity to subordinate a claim. Therefore, inequitable conduct must be found to subordinate their claims.

In an attempt to show inequitable conduct, the plaintiff alleges that the defendants withdrew substantial sums from the Debtor while it was insolvent, that they mismanaged the Debtor, and that they permitted the Debtor to incur debts to trade creditors and employees when they knew the debts would not be paid. Whether the defendants withdrew substantial sums while the Debtor was insolvent is disputed and is a factual issue which cannot be determined on a motion for summary judgment.

The plaintiff alleges that the Debtor's customers were treated poorly by management, some customers did not trust the management, the quality of the product produced by the Debtor was below standards, and the Debtor's process of manufacturing was inefficient. Even if all these allegations were true they do not amount to inequitable conduct for equitable subordination purposes.

■ For mismanagement to amount to inequitable conduct there must be a showing that creditors were harmed because of the conduct *and* that the claimant benefitted from this conduct. Although this conduct may have affected the sales of the Debtor thereby indirectly harming the creditors, there has not been a showing that the defendants benefitted from this conduct. In fact, it is unimaginable how an insider could act in such a way as to harm the corporate income and then receive a personal benefit from such a decrease in income. Therefore, this court cannot find inequitable conduct based on the alleged mismanagement.

The plaintiff further alleges that the allowance of the Debtor to incur further debt when the defendants knew or should have known that the Debtor could not pay these debts amounts to inequitable conduct. Such a supposition would apply to corporate officers of every corporation with financial troubles and require all corporations in such position to close their doors once they appear insolvent. The economic ramifications of such a decision is inconceivable.

The plaintiff argues that the mere initial undercapitalization of the corporation is itself inequitable conduct and warrants equitable subordination. It cites to *Multiponics* and *Mobile Steel* for support of this position. Plaintiff argues that this court must look to the 1975 reorganization date to determine that the corporation was undercapitalized. Defendants argue that the court must look at the 1970 date since this was when the corporation was initially formed. The court in *Multiponics* stated that courts generally look to the initial capitalization to determine whether the corporation was adequately capitalized at the time of its organization. The court went on to state that subsequent capitalization may be relevant to show that the initial capitalization was inadequate and to show further inequitable conduct. 1969 is the year when the Debtor was formed, therefore, that would be the appropriate date to look at to determine whether there was initial adequate capitalization. In our case, Ingalls did not become involved with the corporation until 1970 when he contributed between $125,000 and $134,000 in 1970. Even if we looked at 1970 rather the formation of 1969, the determination of whether the amount contributed was adequate capitalization may not be made based solely on the uncontroverted facts presented.

The issue of whether undercapitalization should cause the claim to be subordinated or treated as a capital contribution has

become blurred. Such confusion has caused some courts and treatises to state that undercapitalization, itself, is sufficient to find inequitable conduct. 3 *Collier on Bankruptcy* ¶ 510.05[4][a] (15th ed. 1989). Other courts have stated that subordination is inappropriate when undercapitalization is unaccompanied by inequitable conduct. *Matter of Pancho's Intern, Inc.*, 26 B.R. 5 (Bkrtcy.M.D.Fla.1982). However, it has long been recognized, under what is known as the "Deep Rock" doctrine, that a shareholder's loans to his company will be treated as a capital contribution when under the equities a company is deemed undercapitalized. *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). The probable cause of the confusion between whether a claim should be equitably subordinated or treated as a capital contribution because of undercapitalization is that the effect of either application is the same. In both cases, the claimant will be paid after all other creditors are paid. If a claim is equitably subordinated it may be subordinated to a general creditor status or even paid after the general creditors. If a claim is determined to be a capital contribution it will not be paid until after all creditors of the debtor are paid and the debtor is liquidated.

■ It is our view that initial undercapitalization, without additional inequitable conduct, is not a sufficient basis for the equitable subordination of a claim. Further, the determination of whether an advance should be subordinated based on the adequacy of the initial capitalization of the Debtor is more appropriately addressed in the question of whether the advance is a loan or a capital contribution.

Here the facts, as established by the plaintiff, fail to demonstrate that the defendants have engaged in inequitable conduct, therefore, it is not necessary to determine whether such conduct harmed other creditors or the Debtor. Further, without a showing of inequitable conduct the claims of the defendants cannot be subordinated.

## CAPITAL CONTRIBUTION

■ Determining the equitable subordination issue prior to determining whether the advance is a loan or a capital contribution is similar to taking the cart before the horse. If it is determined that the claim is a capital contribution and not a debt, then equitable subordination would not have any relevance. Subordination is appropriate when the claimant is undeniably a creditor, but for reasons of equity should be relegated to a rank inferior to that of general creditors. Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vand.L.R. 83 (1961). To be a creditor in bankruptcy the debtor must owe a debt to the claimant. The issue is whether the claim is an indebtedness or whether it is a proprietary interest. If it is determined that the claim is a proprietary interest the claim will be subordinated, not equitably subordinated, as a matter of course since "the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied." Herzog & Zweibel, *supra*, at 94.

The plaintiff argues that the defendants' claims are, in fact, capital contributions and should be paid after all creditors are paid. The defendants counter that the advances were at all times treated as loans, that the corporation was adequately capitalized and that the corporation was able to obtain loans from disinterested third parties, therefore, the advances should not be treated as capital contributions.

The defendants also refer to *Mobile Steel* which states that "equitable considerations can justify only the subordination of claims, not their disallowance." The defendants seemingly interpret this statement to mean that a bankruptcy court only has the power to equitably subordinate a claim and does not have the power to determine if the claim is a debt. The defendants confuse disallowance of a claim with the determination that a claim is actually an interest. "Disallowance of a claim negates its validity and existence ... A claim should be rejected and disallowed ... when it has no basis in fact or law, is non-existent or illegal." Herzog & Zweibel, *supra*, at 86.

The effect of disallowance would be to totally discharge the claim and disallowing the claimant to recover anything from the debtor. In this case, the defendants' claims would not be disallowed but would be classified as a capital contribution.

Prior to 1986, tax courts have been the principal courts which have established the standards to determine whether an advance is a loan or a capital contribution. In those cases, the courts looked to the substance of the advance rather than the form. The first bankruptcy case which enunciated the substance over form standard was the Supreme Court decision in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In 1963, the Fifth Circuit, in *Montclair, Inc. v. Commissioner*, 318 F.2d 38 (5th Cir.1963), acknowledged that there were at least eleven (11) separate determining factors used by the courts to determine whether amounts advanced to a corporation constituted equity capital or indebtedness.[2] The Eleventh Circuit, in *In re N & D Properties, Inc.*, 799 F.2d 726 (11th Cir. 1986), did not cite to *Montclair* but stated that "[s]hareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit." The *N & D Properties* standard is now the appropriate standard to be used in this circuit.

It is the trustee's burden to show that the corporation was initially undercapitalized or show that the loans were made when no other disinterested lender would have extended credit. In this case the plaintiff has that burden. "Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized." *Multiponics, supra*, at 717. Plaintiff's evidence does not establish the circumstances and capital requirements of the debtor at the time of its initial capitalization, thus we cannot find at this point that it was undercapitalized then.

We then turn to the question of whether the uncontroverted facts establish that the advances by Ingalls were made when no other disinterested lender would have extended credit. Two banks made loans to the Debtor since 1983. In 1983, Florida National Bank ("FNB") gave the Debtor a line of credit in the amount of $250,000. In 1984, FNB increased the line of credit to $500,000. As a condition to extending this credit, FNB required that Plastics and Ingalls agree to subordinate their claims and to agree that FNB would have first priority over any indebtedness owed by the Debtor to Plastics or to Ingalls. Additionally, the agreement provided that Ingalls would unconditionally guarantee the payment to the bank. In 1987, NCNB National Bank ("NCNB") agreed to loan the Debtor $387,258. Like the FNB agreement, NCNB would not loan the money to the Debtor unless Ingalls and Plastics agreed to subordinate their debt owed by the Debtor to the debt of NCNB.

In 1985, Ronald Clark, the President of the Debtor, sent a letter to FNB which stated, "[o]ur decision to structure the *investment* in Synergetics in the form of debt has important long range advantages for our stockholders. However, since this *debt-investment* is subordinated to your loan, for all practical purposes it is a $2,600,000 *investment*." (Emphasis added). Likewise, the later agreement to subordinate entered by Ingalls, Plastics and NCNB makes the debt-investment of the defendants appear more like an investment than a loan.

---

**2.** (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions.

In September of 1987, the Debtor prepared for use in soliciting the placement of $2,000,000 of cumulative convertible preferred stock a document entitled "Financial History and Projections." This document contained the following statement:

> There is a substantial amount of debt owed to National Plastics, Inc., a Corporation controlled by Robert W. Ingalls, as of 12/31/86 in the total outstanding amount of $3,169,017. None of the principal portion of this debt will be repaid from the proceeds from this offering. In addition as a part of the offering, National Plastics, Inc. will enter into an agreement whereby it can only be repaid principal amounts of this debt in the future in amounts not to exceed 50% of audited after-tax earnings. Interest on this debt owed to National Plastics, Inc. and any future**related parties debt will be paid quarterly on the same date as this preferred stock, and at the same 8% interest rate.

The offering document further provides that "[t]o the extent shares are not purchased by new investors, the remainder will be purchased by National Plastics, Inc. and paid for by the cancellation of debt."

The standard to determine if a loan is, in fact, a capital contribution is, as stated above, that the loans were made when no other disinterested lender would have extended credit. The loan amounts made from FNB and NCNB totalled $887,258, whereas, the "loans" from Ingalls and Plastics totalled $4,435,477. These advances were made during a 12 year period while the Debtor maintained a significant accumulated operating deficit. In June of 1988 the Debtor had an accumulated deficit in the amount of $4,994,204.91. Ingalls and Plastics had advanced the amount of $4,435,477. The relative equality of the deficit and the amounts advanced makes the advances appear to be "fund[s] contributed to meet the obligations of [the] business," thereby, giving them the appearance of capital contributions and not loans. This, along with the requirement of the subordination of the defendants' "loans" before either bank would extend credit to the Debtor, and the fact that the defendants "loaned" nearly five times the amount that the banks agreed to loan, clearly demonstrates that the Debtor could not obtain additional financing based on its own financial strength.

This is further buttressed by the fact that in seeking to raise additional equity capital, Plastics offered to accept treatment as an equity holder and to even trade debt for equity if necessary. Thus, while calling the advances "debt", Plastics has consistently treated them as equity when seeking additional financing. It is our determination that the uncontroverted facts show that when the defendants advanced their funds no other disinterested lender would have extended credit equivalent to the amount in which the defendants advanced.

The defendants have not presented any evidence, besides the loans mentioned, that the Debtor could have obtained financing from a disinterested lender. Therefore, it is the determination of this court that the sums advanced to the Debtor by Ingalls and Plastics were capital contributions and not loans. Therefore, the defendants' claims are determined to be equity interests rather than claims against the debtor estate.

A separate final judgment will be entered in accordance herewith.

DONE AND ORDERED.