In re INTERSTATE CIGAR COMPANY, INC., Debtor.

OFFICIAL COMMITTEE OF UNSE-CURED CREDITORS OF INTER-STATE CIGAR CO., INC., and as successor by merger to L.S. Amster & Co., Inc., Plaintiff,

v.

BAMBU SALES, INC., Defendant.

Bankruptcy No. 890–81248–478.
Adv. No. 893–8139–478.

United States Bankruptcy Court, E.D. New York.

June 5, 1995.

Teitelbaum, Braverman & Borges by J. Ted Donovan, New Hyde Park, NY, for plaintiff/committee.

Bodian & Eames, New York City, for defendant.

**DECISION ON THE ADVERSARY PROCEEDING COMMENCED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SEEKING TO HAVE THE CLAIM OF BAMBU SALES, INC. EQUITABLY SUBORDINATED**

DOROTHY EISENBERG, Bankruptcy Judge.

The matter before the Court is an adversary proceeding commenced by the Official

Committee of Unsecured Creditors of Interstate Cigar Co., Inc. (the "Plaintiff") seeking to have the claim of Bambu Sales, Inc. (the "Defendant"), an affiliate of the Debtor, equitably subordinated to the claims of the general creditors of Interstate Cigar Co., Inc. (the "Debtor"). The Court having reviewed and considered the pleadings, documentary and testimonial evidence, the post-trial memoranda, and the relevant case law, finds that the money advanced to the Debtor was an injection of capital by an insider and not a true loan. The Plaintiff has sustained its burden of proof under Section 510(c)(1). Accordingly, and for the reasons set forth below, the debt owed by the Debtor to the Defendant is subordinated to the claims of the general creditors of this Debtor.

### FACTS

This case was commenced by the filing of an involuntary petition in bankruptcy under Chapter 7 of Title 11, United States Code (the "Bankruptcy Code") on May 10, 1990. The Debtor consented to the jurisdiction of this Court and on June 7, 1990, the case was converted to one under Chapter 11 of the Bankruptcy Code. The Committee was appointed by the Office of the United States Trustee. The Debtor's officers and counsel did not pursue the reorganization of the Debtor. The Committee assumed the duties of the Debtor on behalf of the creditors of the estate. On February 15, 1991, the Defendant filed with this Court a Proof of Claim in the amount of $1,666,768 (the "Claim"). The Claim is a general unsecured non-priority claim and is docketed as Claim No. 92. The Claim arose as a result of intercompany transfers between the Defendant and the Debtor. The Debtor scheduled the Defendant as a general unsecured non-priority creditor in the amount of $1,747,000. Neither party is sure of the exact amount of the claim and it is not essential to the issue at bar.

The Plaintiff filed a liquidating plan under Chapter 11 of the Bankruptcy Code (the "Plan") which was confirmed by Order of this Court dated April 6, 1992. Pursuant to said Plan, this Court retained jurisdiction "to hear, determine and enforce any and all causes of action which the ... Committee has brought or may bring pursuant to Article V to ... recover preferences, transfers, assets or damages to which the estate may be entitled...."

This proceeding was commenced by the filing of a Complaint and the issuance of a Summons on March 29, 1993. The Complaint is predicated upon Section 510(c)(1) of the Bankruptcy Code. The Plaintiff, pursuant thereto, seeks to equitably subordinate the Claim to the claims of general unsecured creditors, classified by the Plan as Class Six creditors; thereby making the Claim a Class Seven subordinated claim under the confirmed Plan.

It is not disputed that the Defendant, Bambu Sales, Inc., the Debtor, L.S. Amster & Co., Inc. and Seckler Bros., Inc. (the "Companies") were all under common ownership and management. As such, under Section 101(31), the Defendant is an "insider" of the Debtor due to common ownership, directors and officers. At least from 1983, and intermittently to April, 1990, the Defendant made cash advances to the Debtor. At issue are the funds transferred from January of 1989 forward, illustrated in a schedule prepared by the Defendant and offered into evidence by Plaintiff as Exhibit J (the "Work Sheet"). Neither a loan agreement nor a loan note were ever executed with regard to these transfers. These cash advances were not collateralized in any manner and no interest payments were ever made for any of the funds advanced. There is no evidence to support a finding that a "loan" was made to the Debtor with the intent that it be repaid to the entity making the advance.

The evidence demonstrates that the funds at issue were injected capital into the Debtor from a related entity and advanced at a time when the Debtor was insolvent and had insufficient capital. The Debtor's financial losses from operations for the years ended March 31, 1988 and 1989, coupled with a transaction to acquire the interests of certain shareholders of the Companies left the Debtor illiquid, undercapitalized and insolvent. *See Interstate Cigar Company, Inc., L.S. Amster & Co., Inc., Seckler Bros., Inc. and Bambu Sales, Inc.;* Combined Financial

Statements, Additional Information and Independent Auditor's Report; Defendant's Exhibit 2 ("Exhibit 2") at 2. For the year ended March 31, 1988, the Companies lost $731,000. Exhibit 2 at 3. At that same date, the Current Assets of the Companies amounted to $47,653,000, just covering the then Current Liabilities of $42,477,000 while Stockholders' Equity was reported at $7,031,000. Exhibit 2 at 2.

Thereafter, in January of 1989, the Debtor transacted with several stockholders (the "Herman Group") to buy out (the "Buy Out") their interests in the Companies for $1,250,000 in cash and approximately $8,000,000 in notes, contemporaneously creating Treasury Stock amounting to $5,598,000. Exhibit 2 at 2, 8 (n. 6). The Buy Out notes were subject to certain minimum payment requirements; $500,000 per annum for the first two years, $1,000,000 each year thereafter. Exhibit 2 at 8 (n. 6). Additional payments, over and above the minimum per annum requirements, were subject to restrictions predicated on the financial performance of the Companies. Exhibit 2 at 8 (n. 6).

Subsequent to the Buy Out, for the year ended March 31, 1989, the Companies lost $4,008,000. Exhibit 2 at 3. Current Assets rose modestly to $49,271,000 while Current Liabilities climbed to $53,134,000 and Stockholders' Equity was reported at a *negative* $2,322,000. Exhibit 2 at 2. Further, the Companies were in default of loan agreement covenants with their bank. Exhibit 2 at 5 (n. 1a). It is not contested that the unsecured creditor's claims arose subsequent to the Buy Out, when the Debtor was insolvent.

In March of 1989, the Debtor and the Defendant entered into a licensing agreement (the "Royalty Agreement") pursuant to which the Debtor was to assume the operations of the Defendant and pay royalties to the Defendant on related sales. *See Transcript of Examination Before Trial of Sherman Saiger,* Plaintiff's Exhibit H ("Saiger Deposition") at 121. The Defendant was neither represented during the "negotiation" of the Royalty Agreement nor did the operations of the Defendant materially change following commencement of the Royalty Agreement. Saiger Deposition at 123. The Defendant collected the accounts receivable due to the Debtor and credited them to the Debtor's account. The intercompany transactions related to the Royalty Agreement were merely a continuation of the periodic cash advances from the Defendant to the Debtor.

### DISCUSSION

In the Joint Pre–Trial Statement, the Plaintiff requested the Court to find that the cash advances made by the Defendant to the Debtor were, in fact, capital infusions which should be equitably subordinated to the claims of the unsecured creditors represented by the Plaintiff. The Court, in its discretion, believes that where the Debtor is a closely held corporation in receipt of cash advances from an affiliated entity over a prolonged period of time, inquiry must be made as to the character of those advances before considering equitable subordination of the affiliate's claim. Such an inquiry is intended to determine whether the Claim is best described as a capital contribution or a loan.

"Determining the equitable subordination issue prior to determining whether the advance is a loan or a capital contribution is similar to taking the cart before the horse." *Diasonics, Inc. v. Ingalls,* 121 B.R. 626, 630 (Bankr.N.D.Fla.1990). Where a claim is found to be a capital contribution and not a debt, equitable subordination lacks relevance. *Diasonics, Inc.,* 121 B.R. at 630. A finding of a proprietary interest must result in subordination because capital funds are provided to cover the debts of the entity and shall not be satisfied until all other classes of debt have been repaid. *Id.* at 630. Like the defendants in *Diasonics,* here the Defendant asserts that the advances were loans. Since the Supreme Court decision in *Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), the bankruptcy courts have weighed substance over the form of the advance. *Diasonics, Inc.,* 121 B.R. at 631. In *Pepper,* the Supreme Court approved subordination, even denial, of the claim of the debtor's principal stockholder; the stockholder had, inter alia, used "bookkeeping entries" to enhance his claim against the debtor, rela-

tive to the claims of other creditors. *Pepper,* 308 U.S. at 312, 60 S.Ct. at 247–48.

■ A significant test for capital contribution is whether a disinterested lender would have made such loans at the same time. *In re N & D Properties, Inc.,* 799 F.2d 726, 733 (11th Cir.1986); *Montclair, Inc. v. Commissioner of Internal Revenue,* 318 F.2d 38, 40 (5th Cir.1963); *Diasonics, Inc.,* 121 B.R. at 631. Based upon the testimony adduced and the evidence presented, it appears that the Debtor lacked the financial strength to obtain equivalent credit from an unrelated third party lender once the Buy Out occurred in January, 1989. The uncontroverted testimony of Kenneth Simon, Certified Public Accountant and Partner in Ernst & Young, accountants for the Plaintiff, was that no legitimate unrelated third party lender would have made the advances the Defendant made to the Debtor subsequent to the Buy Out. The documentary evidence clearly supports that expert opinion.

The Companies' audited financial statements, found in Exhibit 2, reflect a weak financial condition. It is clear to this Court that financial losses, at least in part related to the Buy Out, severely impacted the equity base of the Companies and liquidity evaporated. The figures for both years show losses; $731,000 for the year ended March 31, 1988 and another $4,008,000 for the year ended March 31, 1989, which severely depleted retained earnings. Exhibit 2 at 3. The then Current Assets of the Companies remained relatively unchanged from the previous year while Current Liabilities rose nearly 25% and exceeded the Current Assets by almost $4,000,000. Exhibit 2 at 2. The Buy Out drained $1,250,000 in cash from the Companies, insuring the disappearance of working capital. Exhibit 2 at 8 (n. 6). Moreover, the Buy Out created Treasury Stock of $5,598,000. Exhibit 2 at 2. Coupled with the eroded retained earnings, a negative equity base arose and the Companies became insolvent. Finally, the Defendant's accountants, then Touche Ross & Co., stated in the Opinion Letter, dated August 15, 1989 and an integral part of the financial statements, that there was a question of whether the entities would continue to operate due to "recurring losses from operations and ... net capital deficiency" which put the existing credit arrangements at risk for noncompliance. Exhibit 2 at 1. This financial condition made it unlikely that any third party lender would have made advances similar to those made by the Defendant.

■ The foregoing third party lender test need not stand alone; not less than eleven factors may be applied by a court to determine whether cash advances to a corporation are loans or capital investments. *In re Herby's Foods, Inc.,* 2 F.3d 128, 132 (5th Cir. 1993); *Montclair, Inc.,* 318 F.2d 38 at 40. Included among the factors is the ability of the corporation to obtain financing from a third party lender; the name given to the debt instruments; the maturity date; the source of payments; payment of interest from corporate allocation for dividends; the enforcement of payment of principal and interest; participation in management; classification relative to regular corporate creditors; the sufficiency of capitalization; nature of interest between creditor and stockholder; and finally, the intent of the parties. *Montclair, Inc.,* 318 F.2d at 40.

■ This Court must examine the intent of the parties closely. The Defendant was an insider of the Debtor, and as such a higher degree of scrutiny is required. *Pepper,* 308 U.S. at 311, 60 S.Ct. at 247; *In re Fabricators, Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991); *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1282 (8th Cir.1988). "[T]he mere fact of an insider relationship is insufficient to warrant subordination. The insider status goes only to establishing the standard to apply in reviewing the insiders conduct." *Fabricators,* 926 F.2d at 1467. "When the claimants are insiders of the debtor, the claimants' conduct is closely scrutinized and the trustee need only prove that they breached a fiduciary duty or engaged in conduct that is somehow unfair." *Bellanca Aircraft,* 850 F.2d at 1282, n. 13. In the case at bar, although the advances date from at least 1983, there is no evidence of debt instruments or loan documentation to suggest a maturity date, payment schedule, or interest provision. No evidence has been offered that interest was ever paid for any of the funds advanced.

The compelling testimony and documentary evidence establish the cash advances as capital infusions to a financially bleeding organization.

■ The Court next considers the Royalty Agreement, alleged by the Defendant to have effectively ended the cash advance arrangement; thereby placing any subsequent cash transfers from the Defendant to the Debtor into the category of royalties. As previously stated, the Defendant is an insider of the Debtor. There is no offer of any corporate minutes to reflect the change in the relationship between the parties. A representative of the Defendant's management, Mr. Sherman Saiger, now deceased, testified, by deposition, that the Defendant was not represented in the "negotiation" of the Royalty Agreement which Mr. Saiger drafted. Saiger Deposition at 123. His uncontroverted testimony demonstrates to this Court that the Royalty Agreement was created merely to avoid tax liability. Saiger Deposition at 121, 122. Further evidence as to the weakness of the Agreement as anything but a continuation of a capital contribution, is Mr. Saiger's statement that operations continued essentially unchanged. Saiger Deposition at 123–125. Finally, the funds transferred between the Defendant and Debtor, allegedly under the terms of the Royalty Agreement, are characterized by the Defendant as settlements on account receivables collected by the Defendant but due to the Debtor. However, the Defendant transferred funds, by checks marked "loan," to the Debtor, during the same period of time and those advances are further evidenced by the Work Sheet generated by the Defendant.

Given the deposition of Mr. Saiger, the testimony of Mr. Simon and the documentary evidence presented, the Court is not persuaded as to the credibility of the proposed substance of the Royalty Agreement. This Court is unwilling to permit such a document to shield the continued cash advances from the Defendant to the Debtor as intercompany reconciliations of account receivables or, in the alternative, royalty payments.

Based upon the foregoing facts, the Court concludes that the cash advances from the Defendant to the Debtor, in particular from the time of the Buy Out in January, 1989, and continuing to April, 1990, were capital contributions. The absence of documentary proof of a legitimate borrowing arrangement, the insolvency of the Debtor from the time of the Buy Out and the transparency of the Royalty Agreement all serve to support this conclusion. *Montclair, Inc.*, 318 F.2d at 40.

■ Even if this Court opted to forego a capital contribution analysis, it would still be necessary and proper to equitably subordinate the claim made by the Defendant to those of the unsecured creditors represented by the Plaintiff. The three-part test for equitable subordination includes: 1) inequitable conduct by the claimant; 2) such misconduct giving rise to an unfair advantage for claimant or bringing harm to the creditors of the debtor and 3) equitable subordination must be consistent with the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977). *See also Bellanca Aircraft*, 850 F.2d at 1282; *N & D Properties, Inc.*, 799 F.2d at 731. Inequitable conduct may include: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) the claimant's use of the debtor corporation as a mere instrumentality or alter ego. *Herby's Foods, Inc.*, 2 F.3d at 131. The court in *Herby's*, as here, considered an unsecured creditors committee's request for equitable subordination of insider creditors' claims upon a Chapter 11 debtor. *Id.* at 128. That court explained undercapitalization as the inadequacy of capital contributed to a debtor corporation. *Id.* at 131. The insufficiency may be shown either by evidence of inadequate funds to support operations or inability of the debtor to borrow similar sums from an "informed outside source." *Id.* at 131, 132.

As already discussed, Mr. Simon's testimony and the Opinion Letter of the Defendant's accountants, Touche Ross & Co., establish that the Debtor was undercapitalized and insolvent from the time of the Buy Out in January, 1989. To characterize the advances as loans would sanction the inequitable nature of these transactions. They are neither at arms-length nor fair and are better characterized as self-serving manipulations of the Companies cash position. Knowing the

Debtor's financial condition, the Defendant supplied the cash to the insolvent Debtor under the guise of the Royalty Agreement. Without these funds, the Debtor would not have been able to continue operations and the parties represented by the Plaintiff would not have extended credit and would not have thereby been harmed.

 Since the Claim is that of an insider of the Debtor, the Court is required to weigh two principles relative to the inequitable conduct: 1) following the Plaintiff's presentation of unfair conduct, the Defendant has the burden to demonstrate the good faith and fairness of the disputed transactions and 2) the Court gives "special scrutiny" to the Defendant's transactions with the Debtor. *Pepper*, 308 U.S. at 306, 60 S.Ct. at 245; *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1557 (11th Cir.1990); *Mobile Steel*, 563 F.2d at 702. Challenged with the Defendant's own evidence, the financial statements and related documents of the Companies, the Defendant failed to meet the shifted burden for an insider of the Debtor to prove the fairness of the disputed transactions. *Lemco Gypsum*, 911 F.2d at 1557; *N & D Properties*, 799 F.2d at 731; *Mobile Steel*, 563 F.2d at 701.

Moreover, the Defendant's assertion that the Buy Out created no more than a "technical insolvency" is without merit. The long-term portion of the Buy Out arrangement called for $8,000,000 to be paid in a series of annual installments. The Defendant cites to a footnote in the offered financial statements of the Companies and claims any payment was subject to the restriction of no more than 50% of after tax profits of the Companies for the fiscal year preceding the date of payment. Significantly, the Defendant overlooks the fact, stated in the same financial footnote, that the annual payments "shall never be less than $500,000 on the first and second anniversary date and $1,000,000 on each anniversary date thereafter." Such minimum requirements preempt any basis for denying that actual long-term debt was established with the Buy Out. Furthermore, as this Court has already discussed, the advances do not withstand close scrutiny.

## CONCLUSION

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. Sections 1334 and 157(a). This is a core matter pursuant to 28 U.S.C. Section 157(b)(2)(B).

Based upon the foregoing, this Court finds that the Defendant's Claim represents a capital contribution to the Debtor, requiring subordination to the Class Six creditor claims. Alternatively, the Claim will be equitably subordinated to the Class Six creditors pursuant to the confirmed Plan.

Settle an Order within seven (7) days in accordance with this Decision.