Filed: December 17, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 97-2205
(CA-96-226-2)

---

Banchory Shipping Company, Limited,

Intervenor - Appellant,

versus

Banco Wiese Limitado,

Intervenor - Appellee.

---

O R D E R

---

The court amends its opinion filed November 10, 1998, as follows:

On page 7, third full paragraph, line 2 -- the word "charted" is corrected to read "chart<u>er</u>ed."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

OST-WEST-HANDEL BRUNO BISCHOFF
GMBH,
<u>Plaintiff,</u>

BANCHORY SHIPPING COMPANY,
LIMITED,
<u>Intervenor-Appellant,</u>

BANCO WIESE LIMITADO,
<u>Intervenor-Appellee,</u>

SIDDIQUI OWAIS; SYED SAJJUD-UE-
HASSAN; SYED ZAIDI HUSSAIN ITIBA;
AHMAD ASHFAQ; ALI ANWAR;
MUHAMMAD LAL; MOHAMMAD WAZIR;
MUHAMMAD ILYAS; SOUZA JOSE;
SHAIKH MUHAMMAD ISMAIL; ZAFAR
IQBAL; YOUNOS S/O KUNDAN MASIH;

No. 97-2205

SHAMSUDDIN S/O NASAR GLAHI;
MASIH HIDAYAT; KHAN ABDUL
HAMEED; TEMORI SALMAN WAGAS;
MUHAMMAD TALHA; SYED
MUHAMMAD IRFAN; ABDUL HANAN;
SYED HUSSAIN SHABBIR; A. K. PAL;
R. R. AMONKAR; ADINARAYANA
ARJALA; N. M. PEREIRA; M. S.
MAHENDRA; K. P. MADHANAN; DILIP
PRADHAN, Crew Members of the
M/V Pride of Donegal; PLAZA
FUELING AGENTS, INCORPORATED;
NICHOLSON TERMINAL & DOCK
COMPANY; RHS CONSULTANTS,
INCORPORATED; DREADNOUGHT
MARINE, INCORPORATED; NEW STAR
SUPPLY COMPANY, INCORPORATED;

WHITE STACK TOWING &
TRANSPORTATION COMPANY,
INCORPORATED; TRANSWORLD,
INCORPORATED, d/b/a Global Ship
Services, Limited; YUKONG LINE
LIMITED; INTERNATIONAL POWER
PRESSES, LIMITED, Individually and
as agent for J.B.M. Tools, Limited
and G.K.W. Limited; AMERICAN
DIESEL AND SHIP REPAIRS,
INCORPORATED; P.J. BRAND, B.V.;
BUREAU VERITAS NORTH AMERICA,
INCORPORATED; HYUNDAI CANADA
INC., a/k/a Hyundai Corporation
Candad; T. PARKER HOST,
INCORPORATED; CERES MARINE
TERMINALS, INCORPORATED; PERVEZ
A. SYED; TWINS MARINE REPAIRS &
SUPPLIES, INCORPORATED; OCEAN
CONSULTING & SUPPLY,
INCORPORATED,
Intervenor-Plaintiffs,

v.

PROJECT ASIA LINE, INCORPORATED;
PROJECT ASIA LINE, INCORPORATED, in
personam; M/V PRIDE OF DONEGAL,
her engines, tackle, appurtenances,
etc., in rem; M/V PRIDE OF
DONEGAL, her engines, machinery,
tackle, furnishings, apparel, etc., in
rem; EMPIRE SHIPPING, S.A.; EMPIRE
SHIPPING, S.A., Monrovia,
Intervenor-Defendants,

2

PERHER SINGH SATINDER, Master of
the M/V Pride of Donegal,
Party in Interest,
NEW SULZER DIESEL US
INCORPORATED,
Movant.

OST-WEST-HANDEL BRUNO BISCHOFF
GMBH,
Plaintiff,

BANCHORY SHIPPING COMPANY,
LIMITED,
Intervenor-Appellee,

BANCO WIESE LIMITADO,
Intervenor-Appellant,

SIDDIQUI OWAIS; SYED SAJJUD-UE-
HASSAN; SYED ZAIDI HUSSAIN ITIBA;
AHMAD ASHFAQ; ALI ANWAR;
MUHAMMAD LAL; MOHAMMAD WAZIR;

MUHAMMAD ILYAS; SOUZA JOSE;
SHAIKH MUHAMMAD ISMAIL; ZAFAR
IQBAL; YOUNOS S/O KUNDAN MASIH;
SHAMSUDDIN S/O NASAR GLAHI;
MASIH HIDAYAT; KHAN ABDUL
HAMEED; TEMORI SALMAN WAGAS;
MUHAMMAD TALHA; SYED
MUHAMMAD IRFAN; ABDUL HANAN;
SYED HUSSAIN SHABBIR; A. K. PAL;
R. R. AMONKAR; ADINARAYANA
ARJALA; N. M. PEREIRA; M. S.
MAHENDRA; K. P. MADHANAN; DILIP
PRADHAN, Crew Members of the

No. 97-2541

3

M/V Pride of Donegal; PLAZA
FUELING AGENTS, INCORPORATED;
NICHOLSON TERMINAL & DOCK
COMPANY; RHS CONSULTANTS,
INCORPORATED; DREADNOUGHT
MARINE, INCORPORATED; NEW STAR
SUPPLY COMPANY, INCORPORATED;
WHITE STACK TOWING &
TRANSPORTATION COMPANY,
INCORPORATED; TRANSWORLD,
INCORPORATED, d/b/a Global Ship
Services, Limited; YUKONG LINE
LIMITED; INTERNATIONAL POWER
PRESSES, LIMITED, Individually and
as agent for J.B.M. Tools, Limited
and G.K.W. Limited; AMERICAN
DIESEL AND SHIP REPAIRS,
INCORPORATED; P.J. BRAND, B.V.;
BUREAU VERITAS NORTH AMERICA,
INCORPORATED; HYUNDAI CANADA
INC., a/k/a Hyundai Corporation
Candad; T. PARKER HOST,
INCORPORATED; CERES MARINE
TERMINALS, INCORPORATED; PERVEZ
A. SYED; TWINS MARINE REPAIRS &
SUPPLIES, INCORPORATED; OCEAN
CONSULTING & SUPPLY,
INCORPORATED,
Intervenor-Plaintiffs,

v.

PROJECT ASIA LINE, INCORPORATED;
PROJECT ASIA LINE, INCORPORATED, in
personam; M/V PRIDE OF DONEGAL,
her engines, tackle,

4

appurtenances, etc., in rem; EMPIRE
SHIPPING, S.A.; EMPIRE SHIPPING,
S.A., Monrovia,
Intervenor-Defendants,

PERHER SINGH SATINDER, Master of
the M/V Pride of Donegal,
Party in Interest,

NEW SULZER DIESEL US
INCORPORATED,
Movant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
John A. MacKenzie, Senior District Judge.
(CA-96-226-2)

Argued: September 24, 1998

Decided: November 10, 1998

Before LUTTIG and MOTZ, Circuit Judges, and
BULLOCK, Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Luttig and Chief Judge Bullock joined.

_____

**COUNSEL**

**ARGUED:** Glen T. Oxton, HEALY & BAILLIE, L.L.P., New York,
New York, for Appellant. David Kegebein Sutelan, Christian Lee
Connell, MAYS & VALENTINE, Norfolk, Virginia, for Appellee.

_____

5

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This admiralty case concerns competing claims to proceeds remaining from the sale of a Liberian shipping vessel, PRIDE OF DONEGAL. After a bench trial, the district court rejected the claim of Banchory Shipping Company Limited. Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 970 F. Supp. 471, 483 (E.D. Va. 1997). The court found instead that Banco Wiese Limitado, with a valid preferred foreign ship mortgage on the vessel, was entitled to the proceeds. Id. at 489. In a subsequent unpublished order, the district court denied Banco Wiese's claim for attorneys' fees and costs. Both parties appeal. We affirm in all respects.

I.

Prior to 1995, Santa Lucia Compania Naviera Santa, S.A., a company owned and controlled by Roberto Leigh, owned PRIDE OF DONEGAL. Leigh also owned and controlled a company called Empresa Naviera Santa S.A. In 1992, Empresa applied for a $5 million loan from the Corporation Andina de Fomento (CAF) in order to finance the purchase of the vessel from Santa Lucia. Banco Wiese (the Bank) provided a guarantee to CAF to secure this loan. In exchange, the Bank obtained a mortgage on the vessel.

Meanwhile, title to the vessel remained with Santa Lucia. In September 1994, Santa Lucia chartered the vessel to Project Asia Lines, Inc. (PAL), a chartering company owned and controlled by Peter Gallagher and Saleem Alavi. Funding for PAL was obtained through Calais Investments S.A. and was facilitated by John Williams.

In June 1995, after having paid for repairs to the vessel and in hopes of securing a stable owner for the vessel, PAL entered a memorandum of agreement with Santa Lucia by which Santa Lucia agreed to sell the vessel to PAL or its nominee. In September 1995, because Empresa was unable to make mortgage payments to the Bank, Santa Lucia sold the vessel to PAL's nominee, Empire Shipping S.A., pursuant to this memorandum of understanding. Empire is owned and

controlled by Calais, the same investor group that provided funding for PAL. The purchase of the vessel was completed by Empire assuming the debt Santa Lucia owed to the Bank and by PAL giving Empire a credit of $1.3 million for the payments it had advanced toward repairs of the vessel. Empire then entered into an agreement with PAL under which PAL continued to manage the vessel, now registered to Empire.

When Empire could not make mortgage payments to the Bank, the vessel was again sold on May 30, 1996. This time it was sold at a public auction by order of a Deputy U.S. Marshal. The sale generated $5.1 million. Proceeds were divided among creditors according to priority of claims, see 46 U.S.C.A. § 31326 (1998), and approximately $4 million remain. Both the Bank and Banchory assert entitlement to these remaining funds and each contends that its claim has priority over the other.

The Bank is a "Rule C" claimant seeking to enforce an admiralty lien. Fed.R.Civ.P. Admiralty Supp. Rule C. The Bank claims that it is entitled to the proceeds by virtue of a preferred foreign ship mortgage that it holds against the vessel. If this mortgage is valid, the Bank enjoys priority over any Rule B claimants. 46 U.S.C.A. §§ 31326(b), 31301(6)(B) (1998).

Banchory's claim is a bit more complicated. Banchory owns a vessel named the ATLANTIC LILY, which it chartered to PAL in January 1996. Because PAL never paid Banchory for this charter hire, Banchory seeks to satisfy its unpaid charter claim through the proceeds from the sale of PRIDE OF DONEGAL. Hence, Banchory is a "Rule B" claimant. Fed.R.Civ.P. Admiralty Supp. Rule B. Under Rule B, claims can be brought in personam or in rem against goods and chattels of the defendant. Id. Thus, in order for Banchory to have any claim to the proceeds, it must demonstrate that PAL was the owner of PRIDE OF DONEGAL. Recognizing that Empire, not PAL, was record owner of the vessel, Banchory asserts that PAL and Empire were mere alter egos and that PAL actually owned the vessel.

Banchory further argues that the Bank enjoys no priority over Banchory either because the Bank's mortgage is invalid or because that mortgage should be equitably subordinated to Banchory's claim given

7

the role the Bank played in the allegedly fraudulent conveyance of funds from PAL to Empire.

## II.

Federal admiralty jurisdiction stems from 28 U.S.C.A. § 1333 (1993). In this case, in which a preferred foreign ship mortgage is at the heart of the dispute, our appellate jurisdiction arises from 46 U.S.C.A. § 31325(c) (1998) and 28 U.S.C.A. § 1291 (1993). See also McCorkle v. First Pennsylvania Banking & Trust Co., 459 F.2d 243 (4th Cir. 1972). We review the district court's findings of fact for clear error. Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985); Yarmouth Sea Products Ltd. v. Scully, 131 F.3d 389, 392 (4th Cir. 1997).

In order to prevail on appeal, Banchory must demonstrate that the district court clearly erred both in (1) rejecting its contention that PAL was an alter ego of Empire and (2) holding the Bank's mortgage valid or refusing to find that the Bank's claim should be equitably subordinated to Banchory's claim. We first address the threshold, alter ego, argument.

## III.

Application of the factors set forth in Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 65 (4th Cir. 1989), and DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 684-87 (4th Cir. 1976), guide the determination of whether one entity constitutes the alter ego of another. These factors include gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness. Id. See also United States Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828-29 (4th Cir. 1992) (introducing overlap of directors as additional factor). Such a determination is to be made on a case-by-case basis. DeWitt, 540 F.2d at 684.

Both parties properly recognize that these factors apply here despite the fact that neither Keffer nor DeWitt involve admiralty dis-

8

putes. It is well established that an admiralty court can review questions of fraud and alter ego. See Swift & Co. Packers v. Compania Colombiana del Caribe, 339 U.S. 684, 689 n.4 (1950). Furthermore, in an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point. See Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981); Bell v. Tug Shrike, 332 F.2d 330, 332-33 (4th Cir. 1964). The district court, therefore, correctly relied on the DeWitt-Keffer factors to shape its review of the alter ego claim. In applying these factors a court must focus on "reality and not form, [on] how the corporation operated and the individual defendant's relationship to that operation." DeWitt, 540 F.2d at 685.

Before considering the district court's application of these factors, we note that Banchory's alter ego claim is unorthodox. The majority of alter ego cases, including DeWitt and Keffer, involve an overreaching corporate officer or a parent-subsidiary relationship. DeWitt, 540 F.2d at 683 (corporation acted as alter ego of its president; corporate veil pierced to hold president personally liable); Keffer, 872 F.2d at 61 (subsidiary acted as alter ego of parent corporation; parent company held liable for debts of subsidiary). Banchory admitted at oral argument that its claim does not follow this pattern but contended that the "identity" theory of alter ego can provide the basis for a claim, cf. Holcomb v. Pilot Freight Carriers, Inc., 120 B.R. 35, 40 (Bankr. M.D.N.C. 1990), if the DeWitt-Keffer factors are satisfied. Accordingly, in all events, we must determine if the district court correctly applied those factors.

With regard to the first factor, undercapitalization, Banchory argues that $1.8 million in funding provided by Calais to PAL in 1994 and 1995 constituted a capital investment and that Calais' removal of these monies to effectuate the purchase of the vessel by Empire left PAL grossly undercapitalized. The district court found to the contrary. It concluded that the funds transferred from Calais to PAL constituted a loan rather than a capital investment. The district court noted that the parties made no distinction in manner or form between the initial infusion of funds, which all acknowledge was a loan and was readily paid back, and the further payments from Calais to PAL.

Relying on In re Interstate Cigar Co., Inc., 182 B.R. 675, 680 (Bankr. E.D.N.Y. 1995), Banchory maintains that because no promis-

9

sory note evidenced the $1.8 million transaction, it did not constitute a loan. That case, however, properly recognizes that many factors must be considered when distinguishing between debt and capital investment and properly focuses on the intent of the parties. Id. at 679-680. See also In re Colonial Poultry Farms, 177 B.R. 291, 299-300 (Bankr. W.D. Mo. 1995); In re Hyperion Enterprises, Inc., 158 B.R. 555, 561-62 (Bankr. D.R.I. 1993). To that end, we note the absence of any instrument of capital investment and Banchory's acknowledgment that PAL agreed to pay Calais 16% annual interest on the $1.8 million principal amount -- hardly marks of a capital contribution. For these reasons, we find no error in the district court's conclusion that Calais loaned funds to PAL. Repayment of that loan obviously did not cause PAL any undercapitalization.

The district court did not separately discuss insolvency, the second factor. Nonetheless, issues of insolvency and siphoning of funds bear a close relation to the undercapitalization factor, which the court did carefully review. As part of its undercapitalization analysis, the court noted that PAL continued operations well after the vessel was sold to Empire. In fact, PAL provided funds to Empire for the maintenance of the vessel after the sale had been completed. The record shows that PAL was not insolvent and that Empire's purchase of the vessel constituted a means for PAL to recoup the money it had already put into the ship's repairs. Moreover, because we agree with the lower court that Calais loaned funds to PAL, repayment of that debt cannot properly be considered "siphoning" of funds.

As to the third factor, the district court recognized that Empire was somewhat lax with respect to corporate formalities and records. Specifically, although the requisite documents of incorporation for Empire were properly prepared and filed, several months passed between the time Empire was established and purchased the vessel and the time shares of the company were issued. Moreover, a corporate attorney appointed the company's officers and directors and the same attorney billed much of his initial work to PAL rather than to Empire. The court acknowledged all of these errors in corporate form, but concluded that Banchory had offered no evidence that Empire perpetuated such "informality" to protect its asserted alter ego, PAL, from liability to creditors. Nor do we find any evidence of this. Indeed, as the district court noted, the purchase of the vessel by

10

Empire constituted PAL's best hope to recapture at least some of the money it had already invested in the vessel's repair.

The district court relied on Williams' testimony that many records had been delivered to Calais in Panama as an explanation for their absence. On appeal, Banchory points to the fact that Williams also testified as to the inadequacy of Empire's records. This testimony does not render the district court's conclusions clearly erroneous. Some of the records may have been missing for explainable reasons; others may have been missing for no good reason. The district court considered all of the evidence and concluded that "any deficiencies that may exist [we]re not sufficient" to establish that "PAL and Empire were alter egos." Ost-West-Handel, 970 F. Supp. at 481. This conclusion entirely accords with DeWitt. See DeWitt, 540 F.2d at 687 ("[t]he conclusion to disregard the corporate entity may not, however, rest on a single factor . . . [and] must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness.").

The district court also carefully reviewed the fourth factor -- whether the officers were non-functioning and whether the officers and directors of the alleged alter egos overlapped. The court recognized that Empire's officers were only nominees but found, on the basis of expert testimony, that use of nominees constituted common practice within the shipping industry. The court also noted that the primary connection between Empire and PAL was Williams, who served as the conduit between Calais (Empire's parent) and PAL, as temporary President of Empire, and as Chief Financial Officer of PAL (although not as a shareholder or director). The district court's conclusion that Williams exerted no control over PAL other than to bring in funds finds ample support in the record. Furthermore, because the money transferred from Calais to PAL constituted a loan, not a capital investment, any influence Williams may have initially exerted over PAL disappeared once PAL repaid its debt to Calais. Finally, Williams' tenure as President of Empire was brief and inactive. The district court did not err in finding no improper overlap in the leadership between Empire and PAL.

With regard to the fifth factor -- whether a dominant stockholder exerted control such that Empire was a mere facade-- the district

11

court found no evidence of any improper influence by Williams or PAL over Empire. The record supports that conclusion as well. In fact, the portion of Williams' testimony relied on by Banchory as proof that Empire was a mere facade, when read in context, reveals that Williams actually referred to Empire as a shell of Calais, its parent, rather than of PAL. Williams also testified that Empire was established to shield liability from its parent, Calais, while releasing PAL from any liability for the vessel. Indeed, it appears that Calais exerted considerable influence over Empire, but Banchory makes no claim against Calais and we do not address any contention that Calais and Empire were alter egos. For this same reason the district court did not err in excluding, as irrelevant, documents that primarily pertained to the relationship between Calais and Empire.

Sixth, and most importantly in determining alter ego status, the district court considered the injustice or fundamental unfairness in rejecting Banchory's contention. As the court recognized, an element of injustice or unfairness is essential in order to demonstrate that two entities are alter egos. Keffer, 872 F.2d at 65; DeWitt, 540 F.2d at 687. On appeal as in the court below, Banchory points to two kinds of evidence that assertedly demonstrate injustice. The first is PAL's alleged undercapitalization. Because we have concluded that the district court did not err in finding that PAL was not undercapitalized due to Calais' removal of funds, that contention fails. The second is PAL's asserted misrepresentations that it owned the vessel. As evidence that PAL misrepresented its assets, Banchory relies on a telex dated January 3, 1996 (eight days before the PAL-Banchory contract). The telex was sent between different departments of Maramaras, Banchory's own company tasked with chartering its vessel the ATLANTIC LILY. Thus, the telex has no bearing on misrepresentations made by PAL. (Moreover, because the telex is not relevant to injustice suffered by Banchory at the hands of PAL, the district court's refusal to admit it into evidence did not constitute an abuse of discretion.)

Additionally, the district court found that the remaining incidents of asserted misrepresentations by PAL could not render an injustice to Banchory because each occurred after Banchory entered into its charter agreement with PAL. We agree that Banchory has failed to show that it relied to its detriment on any alleged misrepresentations by PAL. In fact, in its reply brief Banchory concedes that, "[h]ad the

12

true facts been disclosed, Banchory <u>may well not</u> have done business with PAL." Reply Brief at 13 (emphasis added). This falls far short of detrimental reliance and provides an insufficient basis upon which to conclude that PAL and Empire perpetrated such injustice that they should be deemed alter egos.

Finally, Banchory suggests that the district court failed to apply the <u>DeWitt</u>-<u>Keffer</u> factors and instead "looked at the record as a whole" to misinterpret the facts. Nothing supports this contention. The district court painstakingly considered the proper factors in turn. Its review of the entire record in doing so demonstrates its care, not "a misapplication of the law," as Banchory contends.

We have thoroughly considered all of the evidence, in light of Banchory's multiple arguments, some of which we have not specifically addressed here. We are left with the firm conviction that the district court did not err in finding, on the basis of its proper application of the <u>DeWitt</u>-<u>Keffer</u> factors, that Banchory failed to demonstrate PAL and Empire were alter egos. Because Banchory's claim to the vessel proceeds depends on establishing its alter ego contention, the district court properly rejected that claim. Furthermore, since Banchory has no valid claim, we need not consider Banchory's argument that the Bank's claim should be equitably subordinated to a Banchory claim.

IV.

Supplemental Admiralty Rule E of the Federal Rules of Civil Procedure instructs us that the proceeds from a vessel's sale are "to be disposed of according to law." Fed.R.Civ.P. Admiralty Supp. Rule E(9)(c). The law governing priorities in such instances is the Ship Mortgage Act. <u>See</u> 46 U.S.C.A. § 31301 <u>et seq</u>. (1998). <u>See also Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik ve Ticaret A.S.</u>, 10 F.3d 1015, 1023-24 (3d Cir. 1993) ("Ship Mortgage Act presumptively applies to determine questions of priorities between maritime liens and ship mortgages in United States courts"). According to this statute, the Bank, as the holder of a valid preferred foreign ship mortgage, has priority over the proceeds. 46 U.S.C.A. §§ 31301(6)(B), 31326 (1998). Because Banchory has no valid claim to the proceeds at all, its challenges to the Bank's priority based on an invalid mortgage and, alternatively, on equitable subordination need not be dis-

13

cussed. We therefore affirm the district court's conclusion that Banco Wiese is entitled to the proceeds from the sale of PRIDE OF DONEGAL.

V.

Finally, we address the Bank's cross appeal of the trial court's denial of attorneys fees and litigation costs. The district court has wide discretion in deciding motions for attorneys fees in admiralty cases. Such motions are granted infrequently. Whorton v. Home Ins. Co., 724 F.2d 427, 431 (4th Cir. 1984) ("losing party may be assessed such fees only when it has acted in bad faith or for oppressive reasons"). The decision to impose sanctions under Rule 11 similarly "is within the sound discretion of the trial court" and will be reversed only for a clear abuse of that discretion. Fahrenz v. Meadow Farm Partnership, 850 F.2d 207, 210 (4th Cir. 1988). Given this authority, the district court clearly did not abuse its discretion in denying fees and costs in this case.

VI.

The judgment of the district court is in all respects

AFFIRMED.

14