OST–WEST–HANDEL BRUNO
BISCHOFF GmbH, et al.,
Plaintiff,

v.

PROJECT ASIA LINE,
INC., in personam,

and

Empire Shipping, S.A., in personam,

and

M/V PRIDE OF DONEGAL, her engines,
etc., in rem, Defendants.

Civil Action No. 2:96cv226.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 30, 1997.

Glen T. Oxton, Healy & Baille, New York City, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Ost–West.

Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Banchory Shipping Co., Ltd.

David K. Sutelan, Christian L. Connell, Mays & Valentine, Norfolk, VA, for Banco Wiese Limitado.

## *MEMORANDUM OPINION*

MacKENZIE, Senior District Judge.

This matter came before the Court for trial to decide the parties' respective priorities over funds resulting from the ordered sale of the *M/V PRIDE OF DONEGAL*. This Court heard three days of evidence then ordered that post-trial briefs be submitted and scheduled final argument. After duly considering the parties submissions and hearing argument in the matter, this Court FINDS that the claim of Banco Wiese Limitado has priority over the remaining funds on deposit. Notwithstanding the Court's judg-

ment, claimant Ost–West–Handel Bruno Bischoff GmbH is entitled to an outstanding claim for $26,000 as an *in custodia legis* expense stemming from the attached bunkers expended while the Vessel was under arrest.

## I.

In January of 1996, the *M/V PRIDE OF DONEGAL* ("Vessel"),[1] en route from Detroit, Michigan to Brownsville, Texas, encountered mechanical problems off the Virginia Capes. On or about January 20, these problems forced the vessel to seek repairs in the Port of Hampton Roads.

On February 28, 1996, Ost–West–Handel Bruno Bischoff GmbH ("Ost–West") filed a complaint against Project Asia Line, Inc. ("PAL"), *in personam* and the Vessel, *in rem*, seeking to attach the Vessel and its bunkers pursuant to Rule B of the Supplemental Rules of Admiralty. Ost–West claimed that PAL had failed to pay amounts owing pursuant to a charter party involving another vessel, the *M/V TRUSKAVETS*.[2] Ost–West's charter hire claim was in the amount of $196,750. Additionally, Ost–West claimed that PAL owed an additional $53,250 for bunkers also provided to the *M/V TRUS-KAVETS*. As a result of Ost–West's complaint, the M/VPRIDE OF DONEGAL was attached by the U.S. Marshal Service and remained under arrest in the port of Hampton Roads.[3]

Subsequent this initial attachment on the 28th of February, twenty-two intervening complaints, both Rule B and C, were filed against PAL, the Vessel, and Empire Shipping S.A. ("Empire"), asserting a host of various claims and maritime liens. Of the two individual defendants, only Empire, the registered owner of the Vessel, appeared in this Court to challenge the Vessel's attachment. Shortly after challenging the initial attachment, however, counsel for Empire withdrew by Order dated April 22, 1996. Empire has made no further appearances at subsequent hearings or trial. To date, PAL has failed to appear at any hearing in this action.[4]

On April 12, 1996, this Court ordered that the Vessel be sold at auction in an attempt to satisfy all outstanding liens. On May 8, 1996, Banco Wiese Limitado ("Bank"), filed an Intervening Complaint seeking to foreclose and assert its first preferred Liberian ship mortgage on the Vessel, as well as to obtain a judgment against the Vessel owner, Empire, for the amount owing under the mortgage. Thereafter, on May 15, 1996, Banchory filed its intervening complaint against PAL, *in personam*, in the amount of $923,117.69.[5] This claim was for amounts claimed to be owing on a time charter between PAL and Banchory involving the *M/V ATLANTIC LILLY*.[6]

The Vessel was sold on May 30, 1996, with the Bank succeeding as buyer with a bid of $5,100,000. The sale was confirmed once full payment of the purchase price was tendered to the Clerk of this Court. The U.S. Marshal then delivered a Bill of Sale to the Bank declaring the Vessel free and clear of all encumbrances, and transferring all liens against the Vessel to the proceeds from the sale.[7]

---

1. A general cargo vessel of Liberian registry.

2. Ost–West, as disponent owner of this vessel, had entered into a time charter with PAL dated January 11, 1996.

3. However, Ost–West withdrew its attachment of the Vessel on March 19, 1996. Ost–West's continuing attachment of the bunkers was deemed proper by Order of this Court dated May 20, 1996.

4. However, by Order dated March 11, 1997 honoring the judicial preference for a trial on the merits, this Court denied all of the remaining claimants' motions for default judgment.

5. At trial, counsel for Banchory represented to the Court that the amount of the claim had been revised and currently stands at $635,871.30.

6. PAL entered a charter party with Banchory, the owner of the *M/V ATLANTIC LILLY*, on January 11, 1996. That charter party was breached when PAL's accounts were attached and amounts owed for charter hire and bunkers remained unpaid.

7. Prior to trial, all claims except those of the Bank, Ost–West, and Banchory Shipping Co., Ltd. ("Banchory") were settled or resolved by rulings of this Court.

This Court conducted a bench trial beginning March 17, 1997 and ending March 19, 1997 in order to resolve the respective priorities among the following claims: the Bank's Rule C claim as holder of a first preferred foreign ship mortgage; Ost–West's Rule B claim for unpaid charter hire from PAL's use of the *M/V TRUSKAVETS,* and Banchory's Rule B claim for unpaid charter hire from PAL's use of the *M/V ATLANTIC LILLY.* The facts, as set forth below, are as the Court found them after hearing all the evidence at trial.

## II.

The relevant history of the Vessel, the *M/V PRIDE OF DONEGAL,* dates back to 1990 when it was owned by a Chilean state corporation named Prestige. A Peruvian businessman named Roberto Leigh Riveros ("Roberto Leigh") became interested in the Vessel, and in September of 1990 he negotiated the purchase of Prestige, thereby obtaining the Vessel. To facilitate the subsequent ownership and operation of the Vessel, Roberto Leigh had created a Liberian corporation, Santa Lucia Compania Naviera ("Santa Lucia"). Accordingly, title to the Vessel was transferred to the newly formed Santa Lucia and the Vessel was deflagged in Panama. The Vessel was then transferred to Liberian registry and its name changed to the M/V SANTA LUCIA.

Some time thereafter, Roberto Leigh decided to transfer ownership of the Vessel to an existing Peruvian corporation also under his control, Empresa Naviera Santa ("Empresa"). To accomplish the acquisition of the Vessel, Santa Lucia and Empresa entered into a Stock Purchase Agreement in December of 1990. Under this agreement Empresa was to purchase all existing shares of Santa Lucia for $12,000,000, thereby obtaining the Vessel. The agreement called for a series of monthly payments culminating in a balloon payment of $5,000,000 on or before June 30, 1992.

As the date for the $5,000,000 balloon payment neared, Empresa sought financing to aid in their efforts to purchase the Santa Lucia stock as well as the Vessel. Empresa contacted and applied to the Corporacion Andina de Fomento ("CAF"), a South American financing entity that makes favorable loans to public and private projects that promote commerce between Latin American countries. However, CAF's internal procedures only allow it to lend money to a borrower that is able to convince an acceptable private bank to guarantee all amounts borrowed. Empresa approached Banco Wiese, the remaining Rule C claimant in this action, when attempting to secure a guarantee.[8]

While the Bank was informally considering Empresa's request to guarantee the $5,000,000 CAF loan, Empresa and CAF entered into a Foreign Trade Loan Agreement ("Loan Agreement"). This Loan Agreement set forth the terms as well as the purpose of the loan, to partially finance the purchase of the *M/V SANTA LUCIA.* The Loan Agreement also stated that no disbursement of loan proceeds would be made by CAF until an acceptable bank guarantee had been properly secured. Accordingly, on May 26, 1992, Empresa made a formal application to the Bank for a guarantee on ten promissory notes, each in the amount of $500,000 and to be paid to CAF on a semi-annual basis over a period of five years.

The Bank's executive committee approved the guarantee, but in return required that a first mortgage be executed in their favor over the Vessel being acquired, the *M/V SANTA LUCIA.* Additionally, the Bank required that a second mortgage be executed in their favor over either the *M/V SANTA ROSA* or the *M/V SANTA RITA,* both of which were vessels already owned by Empresa. Empresa agreed to this, and on June 23, 1992, the Bank issued the needed guarantee on Empresa's loan from CAF. Accordingly, on June 26, 1992, CAF transferred $5,000,000 in loan proceeds to the account the Bank held with them. The Bank then transferred almost $5,000,000 in proceeds to Empresa's account but held the funds pending confirma-

---

**8.** The evidence suggested that the relationship between Empresa and the Bank had begun some months earlier, in September of 1991, when the Bank issued a $1 million line of credit to Empresa in exchange for the personal guarantee of Roberto Leigh.

tion that the required ship mortgages had been duly executed and validly recorded.

The first ship mortgage on the *M/V SANTA LUCIA* was prepared by Mr. Alan Van Praag, then counsel for the Santa Lucia corporation. The mortgage was executed in favor of the Bank on July 6, 1992 and recorded with the Liberian Deputy Commissioner of Maritime Affairs for the Republic of Liberia that same day. Following confirmation that both the first mortgage on the *M/V SANTA LUCIA* and a second mortgage on the *M/V SANTA RITA* had been recorded, $3,000,000 in loan proceeds were released by the Bank, and at the request of Empresa this amount was transferred to Santa Lucia. On July 22, 1992, the balance of the loan proceeds were transferred to Santa Lucia.[9]

In December of 1992, shortly before the first in the series of ten semi-annual promissory notes became due, Empresa approached the Bank regarding their inability to make the $500,000 payment. The Bank agreed to refinance the note, number 2225, and after paying the amount due to CAF in an attempt to keep the loan they had guaranteed current, they issued Empresa a new note. Six months later, in June of 1993, the second of Empresa's original notes on the CAF loan became due. Empresa was again unable to meet the obligation, and the Bank duly paid the amounts owing to CAF. The Bank again rescheduled, issuing Empresa a new note to be due, with interest, on December 27, 1993.

In the fall of 1993, Empresa had reached an agreement to sell the *M/V SANTA RITA*, the vessel over which the Bank held a second mortgage in the amount of $2.5 million. In exchange for the Bank's release of its second mortgage, Empresa paid the Bank $1 million in proceeds from the sale of the *M/V SANTA RITA*, increased the first mortgage on the *M/V SANTA LUCIA* to $7.5 million, and procured Santa Lucia's guarantee on all of

Empresa's debt. The original mortgage (or "1992 Mortgage") on the *M/V SANTA LUCIA* was amended in December of 1993 to reflect the increase in principal to $7.5 million and then duly recorded with the Liberian Deputy Commissioner of Maritime Affairs.

Later that month, on December 26, 1993, the previously rescheduled note from June became due. Empresa again was unable to honor the obligation, and the Bank once again agreed to refinance as a part of their continuing attempt to keep the CAF loan current. Two days later, on December 28, 1993, Empresa's third note from the original series became due. The Bank agreed to pay the amount owed to CAF and reschedule the note. In light of Empresa's poor financial situation, the Bank also decided to reschedule all seven of the remaining notes originally issued in favor of CAF The Bank issued seven new notes each in the amount of $571,-428.57,[10] to be paid semi-annually with the first maturing on June 30, 1994. At the end of June 1994, the first of this group of the seven re-issued notes came due. Finding their financial situation still unimproved, Empresa was again unable to pay, and the Bank again refinanced.

In September of 1994, Santa Lucia entered into a chartering agreement with a newly formed corporation named Project Asia Line, Inc. ("PAL"), whereby PAL would operate the Vessel[11] for an agreed amount of daily hire. PAL was a Delaware corporation with two principal shareholders, Peter Gallagher and Saleem Alavi. Alavi held half of PAL's stock, as well as the positions of vice president and secretary, while Gallagher served as president and held the remaining shares of stock. Despite being the sole stockholders, neither Gallagher nor Alavi had made a substantial cash investment to get the business up and running. Instead, Gallagher

---

**9.** However, the evidence at trial established that despite the transfer of amounts sufficient to fulfill the Stock Purchase Agreement, it was unclear whether Empresa ever took ownership over Santa Lucia's stock. The record did establish that for some unknown reason Santa Lucia remained as the registered owner of the Vessel.

**10.** The increase in principal from $500,000 reflected interest accrued as a result of the rescheduling of payments.

**11.** The charter arrangement between PAL and Santa Lucia initially proved successful and the name of the Vessel was changed from the *M/V SANTA LUCIA* to the *M/V PAL WIND* at PAL's request.

was contacted by Mr. Mike Demots and told that he would provide all the necessary capital to start a shipping company. Gallagher had then contacted Alavi, whom he knew to have significant experience in the industry by virtue of his operation of Sea Commerce, a ship brokering company.

The initial capital investment in PAL that Demots had promised was ultimately provided by a group of Panamanian investors operating under the name Calais Investments, S.A. In addition to Gallagher and Alavi, both Demots and Mr. John Williams, the main contact between the Calais investors and PAL, served as officers of PAL. Demots was named Chairman of PAL, and Williams was named Chief Financial Officer, but neither held any shares.

Calais initially provided Gallagher with between $200,000 and $400,000. This amount reflected a short-term loan and was repaid almost immediately. Over the coming year, Calais, through Williams, supplied PAL with an additional $1.8 million to get the business up and running. Gallagher stated that at first PAL and Calais operated under a verbal agreement reached in June of 1994; however this agreement was reduced to writing in early November of 1995.

Although entering into a charter party with Santa Lucia in September, PAL did not take delivery of their Vessel until October 22, 1994, just off the Canary Islands. On November 4, 1994, while en route to the Great Lakes the Vessel lost the third of its generators,[12] and Empresa's financial situation prevented them from paying for tugs to return it to port. When Mr. Alavi learned of Empresa's financial troubles he quickly realized that if PAL did not advance the cost of towage, this Vessel would quickly become a derelict. Consequently, PAL agreed to advance the cost of towage, and the Vessel was taken to Sept Iles, Canada where the necessary repairs were undertaken. Once the generator was restored, the Vessel embarked for the Great Lakes where it was scheduled to take on a full load of cargo. After doing so and barely making it out of the Great Lakes before the winter closing, the Vessel again broke down and became stranded outside of Montreal.

In the interim, the next of Empresa's refinanced notes had come due on December 26, 1994, and once again they defaulted. The following day the Bank issued a letter indicating Empresa's ongoing default and demanded payment from both Empresa and Santa Lucia. In response, the Bank received notice that efforts were already underway to sell the *M/V SANTA LUCIA.* Encouraged by this news and in an attempt to aid in the efforts to sell the Vessel, the Bank approved further credit to Empresa so that necessary repairs could be made to the Vessel, and refrained from foreclosing.

As a result of the Vessel's continuing problems, by early January 1995, PAL had already advanced approximately $740,000 on behalf of the Vessel owner. PAL had apparently wanted to establish a solid reputation within the shipping industry and believed that it could recover these advances by deducting them from any charter hire owed to Santa Lucia. However, as Santa Lucia and Empresa continued to experience financial troubles, PAL became increasingly concerned that it would not be able to recover the amounts advanced for owner's expenses. The principals of PAL concluded that the sale of the Vessel would be the only way to recover the significant amounts already advanced. Accordingly, individuals with PAL, namely Williams, began to participate quite heavily in the efforts, apparently underway, to find a buyer for the Vessel.

In February of 1995, Empresa advised the Bank that the efforts to sell the Vessel had proven successful, and that the sale would be to an unnamed purchaser for approximately $6.8 million. The understanding at the time was that $5.5 million in sale proceeds would go to the Bank in exchange for a release from the first naval mortgage, and any remaining sums would be used to reimburse the charterer of the Vessel, PAL, for all owner's expenses advanced during the previous six months. Apparently, however, this

---

**12.** The Vessel had apparently been operating in a state of partial disrepair as the other two generators had not worked for some time.

report was premature as neither Roberto Leigh nor anyone from PAL was ever able to locate a cash buyer for the Vessel. And as continuing efforts to find a buyer proved unsuccessful, the Bank abandoned its hope for a cash buyer and agreed to refinance the sale of the Vessel to a potential new owner.

In June of 1995, as all parties became increasingly impatient, a Memorandum of Agreement ("MOA") was prepared in an apparent last ditch effort to sell the Vessel. The MOA reflected Santa Lucia's agreement to sell the Vessel to PAL, or its nominee, for $6.8 million. The MOA further provided that the balance of the purchase price, less sums advanced by PAL, would be payable to the Bank through the purchaser's assumption of an amended mortgage in the amount of $7.5 million.

Also in June, a meeting took place between certain Bank officials, Roberto Leigh, John Williams, and a prospective purchaser of the Vessel. Williams, on behalf of PAL, represented that they would continue to operate and manage the Vessel for its new owner. Relying on representations from the meeting and the prospect that the Vessel would be sold, the Bank continued to pay Empresa's notes in favor of CAF. In fact, the Bank provided even more funds to Santa Lucia so that additional repairs, necessary for the sale, would be made.

Sometime in July or August of 1995, Empire Shipping was identified to the Bank as the nominee under the Memorandum of Agreement. Empire is most easily described as a corporation organized by the same group of investors, Calais, who had originally loaned approximately $2 million to PAL as they began operations. The amount Calais originally provided to PAL now stood as the initial investment in Empire. It amounted to approximately $1.8 million and took the form

of a credit in favor of PAL for the owner's expenses they advanced to the Vessel.[13] Upon PAL's transfer of this $1.8 million credit, the Calais investors released PAL from any amounts they were obligated to repay under their oral loan agreement. With the exception of Williams briefly being named President and director of Empire, the corporation's other officers and directors were nothing but nominees selected by Alan Van Praag.

By it own terms, the previous time charter between PAL and Santa Lucia was terminated upon the sale of the Vessel. Accordingly, on September 17, 1995, Empire entered into a Ship Management Agreement whereby PAL would serve as the continuing manager and charterer of the *M/V PAL WIND*.

On September 27, 1995, Empire entered into a Note and Loan Agreement with the Bank for $5.5 million dollars. The loan proceeds extended to Empire were duly applied to retire $5.5 million of Empresa and Santa Lucia's outstanding indebtedness, with the balance of any amounts owed by Empresa and Santa Lucia refinanced through another of Roberto Leigh's companies. The original Note required payment in full, $5.5 million, from Empire within 90 days of the date of the Agreement.[14] Alan Van Praag, now acting as counsel for Empire, immediately began negotiating a reduction in the payment schedule.

Throughout the fall of 1995,[15] the Bank repeatedly requested information regarding the principals of Empire from Van Praag. Van Praag, after some prodding, provided most of the requested information and thereafter, the Bank agreed upon a new repayment structure on Empire's loan. The new schedule was based upon estimates of the Vessel's earning potential in light of the new-

---

**13.** Empire had been created by Alan Van Praag at some time prior to August of 1995. When Williams contacted Van Praag about forming a corporation so that the Calais group could assume ownership of the Vessel he used Empire, as all the preliminary paperwork had already been completed.

**14.** The Bank, however, did not pay off the remaining balance owed to CAF under the Empresa guarantee until December 14, 1995.

**15.** On October 20, 1995, at the request of Empire, the name of the Vessel was changed from the *M/V PAL WIND* to the *M/V PRIDE OF DONEGAL*. By letter of the same date, sent to the Liberian Deputy Commissioner of Maritime Affairs, the Vessel's official name became the *M/V PRIDE OF DONEGAL*.

ly signed chartering agreement between Empire and PAL.[16] The initial payment under the rescheduled plan was $249,000, due on or before December 19, 1995.

On December 19, 1995, Empire provided funds in the amount of $249,000 to PAL and directed PAL to wire the funds to the Bank. The Bank confirmed receipt of the funds by letter dated December 20, 1995, sent to Van Praag. The letter also confirmed the extension of the Note and set forth the next payment date as March 18, 1996.

By letter dated February 6, 1996, Van Praag advised the Bank that the Vessel had suffered a casualty off the Virginia Capes. The Bank was to advise the insurance underwriters to make the insurance proceeds payable to Dreadnought Marine, who was undertaking to repair the Vessel. As previously stated, on February 28, 1996, while undergoing necessary repairs in Norfolk, Virginia, the Vessel was attached by Ost–West pursuant to Rule B of the Supplemental Rules of Admiralty.

On March 18, 1996, no payment was made on the Empire Note. Subsequently, the Bank learned of the Vessel's arrest and pending sale and on May 8, 1996, filed its Rule C intervening complaint in these proceedings. As previously noted, the Vessel's sale took place on May 30, 1996. To date, Empire has made no further payments pursuant to the assumed mortgage on the Vessel.

## III.

After a vessel has been sold to satisfy outstanding maritime liens, all funds generated by the sale are divided among creditors on the basis of their respective statutory priorities. *See generally,* 46 U.S.C. § 31326 (1996). Because neither Ost–West nor Banchory provided "necessaries" to the M/V PRIDE OF DONEGAL, see 46 U.S.C. § 31301, the Bank is entitled to priority with regard to the funds from the Vessel's sale if it holds a valid preferred foreign ship mortgage, as defined in 46 U.S.C. § 31301(6)(B). *See* 46 U.S.C. § 31326(b). However, Rule B claimants Ost–West and Banchory have filed

claims against only the charterer of the vessel, PAL. Accordingly, even if the Bank does not hold a preferred foreign ship mortgage, Ost–West and Banchory must demonstrate that PAL held some ownership interest in the M/V PRIDE OF DONEGAL before they can properly share in the proceeds from the sale of this Vessel. *See* Rule B(1) of the Supplemental Rules of Admiralty (proper attachment requires that the affected property actually be the defendant's).

To this end, claimants Ost–West and Banchory argue that PAL and Empire, although distinct entities on paper, operated as "one in the same" or alter-egos. And PAL, although not the registered owner of the Vessel, operated as its owner in fact. Because this question of PAL's interest in the Vessel directly affects the Rule B claimant's standing to share in the sale proceeds on deposit with this Court, it is addressed before considering the validity of the Bank's mortgage on the Vessel.

## IV.

■ The general rule is that a corporation's distinct identity should be upheld unless there are specific, unusual circumstances that call for the court to look behind or beyond the corporate structure. *See Puamier v. Barge BT 1793,* 395 F.Supp. 1019, 1038 (E.D.Va.1974); *Trexler v. Tug Raven,* 290 F.Supp. 429, 440 (E.D.Va.1968), *rev'd on other grounds,* 419 F.2d 536 (4th Cir.1969); *Brown v. Margrande Compania Naviera. S.A.,* 281 F.Supp. 1004 (E.D.Va.1968). It is the burden of any party challenging a corporate identity to establish such circumstances by clear and convincing evidence. *See Puamier,* 395 F.Supp. at 1039.

■ Because demonstrating that one corporation is merely the alter-ego of another is difficult to do through direct evidence, courts look for certain indicia that strongly suggest a disregard for the corporate form. Such indicia include the gross under-capitalization of the subservient corporation, a failure to observe corporate formalities between the two, the nonpayment of dividends, the

**16.** On November 30, 1995, PAL entered into a time charter with Empire under which they

. agreed to charter the Vessel for six years at a daily rate of $7,000.

insolvency of the subservient corporation, the siphoning of funds from the subservient corporation, the non-functioning officers or directors, an absence of corporate records, and complete control by a dominant stockholder. *See Keffer v. H.K. Porter Co.. Inc.,* 872 F.2d 60, 65 (4th Cir.1989); *DeWitt Truck Brokers. Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686–87 (4th Cir. 1976). Additionally, an element of injustice or fundamental unfairness must be present. *Id.*

▮ In addressing the foregoing factors, the Rule B claimants argue that the dealings between PAL and Empire evidence all the necessary hallmarks of corporate alter-egos. Accordingly, the Rule B claimants urge this Court to ignore the formal distinctions between the two and declare PAL the owner of the Vessel. It is this proposition that the Court now considers.

### A. Gross Undercapitalization of PAL

The Rule B claimants contend that Calais' original investment in PAL constituted capital that was ultimately stripped from PAL, in a purposeful manner, when the Vessel was sold to Empire. However, although Calais' approximately $1.8 million original investment in PAL was not secured by a note or other evidence of indebtedness, this Court finds that the evidence establishes that the Calais funds are more accurately described, as the Bank suggests, as a loan pursuant to a floating line of credit to PAL and that even if it were capital, there is no evidence that PAL was ever grossly undercapitalized.

Contrary to the normal situation when a group of investors provides capital to a corporation, the Calais group received no stock in PAL in return for the nearly $2 million they provided. John Williams, as well as Gallagher, stated that the amounts provided by the Calais investors included both a short-term loan of several hundred thousand dollars, as well as a floating line of credit, with any amounts borrowed becoming due at some point beyond an agreed upon two-year

grace period. (Gallagher Tr. 122–23, 129). The evidence clearly showed that the short-term loan was immediately paid back. The Calais group made no distinction in the manner or form between the short-term loans and the additional $1.8 million provided other than to agree that the principal on the $1.8 million would not come due for at least two years. This consistency of method and form evidences Calais' desire to remain a creditor, even if on speculative terms,[17] rather than a capital contributor or shareholder.

Even assuming that the amounts provided by Calais were capital, there was no evidence at trial that this amount was grossly inadequate. Additionally, there was no evidence, as the Rule B claimants have alleged, that PAL's capital was completely stripped when Empire acquired the Vessel. In fact, PAL continued operations well beyond the sale date of the Vessel in September of 1995. PAL continued all chartering operations until February of 1996 before encountering any cash flow problems. Indeed, the enterprise remained a viable charterer up until the time its bank accounts were attached. Further supporting the Court's belief is the fact that during the period following the sale of the Vessel, PAL had sufficient cash to advance close to $2 million in expenses when Empire failed to meet its obligations under the MOA as owner of the Vessel. Finally, just one week prior to having its accounts frozen, Mr. Gallagher testified that PAL's credit was in good standing, having just paid approximately $2.3 million to creditors. (Gallagher Tr. 307). Accordingly, this court finds no support for the proposition that PAL was undercapitalized or was robbed of all its capital during the Vessel's sale.

### B. Failure to Observe Corporate Formalities

In their attempt to establish Empire as PAL's alter-ego, the Rule B claimants point to several irregular corporate actions on the part of Empire. Specifically, Empire was organized and the Vessel acquired in September of 1995, but shares of stock in Em-

---

17. Admittedly, the fact that the Calais funds were to earn a return based of the net profits from PAL suggests a capital investment. However, when considered with the accompanying short-term loans and the sworn testimony regarding the parties' respective understandings of the funds, the Court concludes these sums constituted a loan.

pire were not issued until March or April of 1996. Additionally, these claimants argue that instead of being elected by the shareholders or directors, the officers and directors of Empire were appointed by Van Praag, the attorney retained to organize the corporation and facilitate the sale of the Vessel. Finally, the Rule B claimants rely heavily on the fact that the work being completed by Van Praag [18] was billed to PAL, as instructed by Williams, and not Empire.

However, the record as a whole establishes that any transgressions among PAL and Empire's corporate distinctions were not the result of the two entities being alter-egos. Rather, the blurring of the corporate form, if any, was temporary and the direct result of both the existing relationship between Calais and PAL, as well as the approaching deadline for the Vessel's sale as set forth in the Memorandum of Agreement. Additionally, one cannot correctly consider this point without understanding that Empire was a buyer of last resort, the offspring of all other attempts having failed. The Vessel was in need of repairs and time was of the essence for all those involved. Van Praag, because of his familiarity with the situation and ability to move quickly, was retained to effectuate the organization of Empire as well as the sale of the Vessel, but his apparent misperception as to the true nature of the transaction appears to have caused argument on this point.

At the outset, Van Praag never stated nor even suggested, in any of his testimony, that he was organizing Empire merely as an instrumentality of PAL so that they could assume ownership over the Vessel. Van Praag's direct dealings with Williams, the sole contact for the purchasers of the Vessel and CFO of PAL, while consummating the Vessel's sale appear to be the source of any confusion regarding the PAL and Empire's corporate forms. As the Rule B claimants have seized upon, Williams did instruct Van Praag to bill PAL for the legal work surrounding the Vessel's sale. However, this fact, standing alone, does not logically suggest that Empire was set up to facilitate PAL's ownership of the Vessel. Instead, it reinforces the testimony that a quick resolution was in everyone's best interest and separate billing was a formality that was overlooked to speed the process.

This position is bolstered by the fact that the sale of the Vessel was in everyone's, and especially PAL's, best interest. With regard to PAL, the sale of the Vessel satisfied the amounts owed on the loan from Calais and potentially provided a solvent shipowner to cover expenses as set forth in the MOA. Additionally, PAL, not Empire, had negotiated the MOA with Santa Lucia and was set to lose the substantial investment of time and effort if the sale did not go through on time. Thus, it is understandable that PAL would be willing to cover legal bills while Empire got up and running. Additionally, the record clearly established that after the sale was completed, Van Praag began to bill Empire for any work he undertook on its behalf. Accordingly, this Court finds that Van Praag billing PAL for Empire's formation and its assumption of ownership over the Vessel fails to establish anything beyond a temporary lapse in the corporate distinctions insufficient to justify an alter-ego theory.

### C. Absence of Corporate Records

The Rule B claimants contend that the alter-ego relationship is further evidenced by the fact that Empire kept no accounting records, as well as the fact that organizational documents and minutes of meetings could not be produced in response to their requests. However, it is clear from the evidence at trial that the necessary organizational documents for Empire were prepared by Van Praag and ultimately filed with Liberian officials. Additionally, both Williams and Van Praag testified that corporate minutes were prepared for Empire, all of which were kept by Van Praag. (Williams Tr. 80–81)(Van Praag Tr. 37–38). The absence of any such records at trial was explained by Williams who testified that he personally transported Empire's minute book to the Calais investors in Panama. (Williams Tr. 104).

---

**18.** Mr. Van Praag billed PAL for his time spent consummating the Vessel's sale, registering Empire as the owner, executing the Amendment and Assumption of the Mortgage, and renegotiating the terms of Empire's loan.

Van Praag testified that he also prepared corporate resolutions for all actions undertaken by Empire. Finally, contrary to the assertions of the Rule B claimants, the evidence suggested that the debit and credit records between PAL and Empire were carefully maintained. Indeed, Gallagher testified that Empire owed PAL $2,523,172 at the time of the Vessel's arrest and that they had every intention of pursuing a claim against Empire. (Gallagher Tr. 97). Accordingly, Empire's corporate records are not absent, and any deficiencies that may exist are not sufficient to persuade this Court to leap to the conclusion that PAL and Empire were alter-egos.

### D. Overlap of Officers and Directors

The Rule B claimants focus their argument in this area on Williams' brief tenure as President of Empire, while maintaining his position with PAL, that of Chief Financial Officer. This, the Rule B claimants argue, coupled with the evidence that Empire's other directors were mere nominees, demonstrates a unified control over both companies and should be considered strong evidence of their alter-ego theory. Beyond Williams, however, the Rule B claimants produced no evidence of any overlap between the directors and officers of the two companies.

And while certain testimony suggested that Williams held power over PAL as its sole contact with the Calais group, there was no evidence that Williams had a continuing influence over PAL once the Calais funds were transferred to Empire. Indeed, after the sale of the Vessel, the Calais money was no longer with PAL and beyond PAL serving as manager of Empire's Vessel, the Rule B claimants advanced no theory as to why Williams would continue to take an interest in the daily operations at PAL.

Even when Calais' investment was in place and Williams controlled PAL's line of credit, the evidence before the Court suggested that his position as Chief Financial Officer was mainly to insure his access to the corporation's books as a way to verify that any amounts provided were properly being used for shipping purposes. Additionally, it is undisputed that Williams never held, either before or after the Vessel's sale, any formal power as a shareholder or director of PAL. (Williams Tr. 34–35)(Gallagher Tr. 18–19). In light of the temporary nature of Williams' overlap as an officer of both PAL and Empire, as well as the lack of any evidence of a tangible effect on the operations or control over the two companies, this Court finds that the Rule B claimants' fail to establish their alter-ego theory on this point as well.

### E. Non-functioning of Officers and Directors

Along similar lines, the Rule B claimants argue that after Williams resigned as President, Empire was left without any functioning officers, thus illustrating its existence as a sham corporation over which Williams, Gallagher and Alavi were easily allowed to gain control. The Rule B claimants argue that PAL's participation in Empire's efforts to renegotiate its repayment schedule on the assumed mortgage demonstrates this very point.

Once again, the evidence as a whole does not support such a conclusion. Both Gallagher and Alavi have denied taking any actions on Empire's behalf nor even having any interest in its operation. (Gallagher Tr. 87–89)(Alavi Tr. 173–74). Gallagher and Alavi maintain that throughout the sale of the Vessel, Williams represented Empire and that PAL's involvement in the renegotiation sessions with the Bank evidences nothing beyond its desire to keep the Vessel operating within the parameters of the six-year charter agreement with Empire. Indeed, the evidence established that PAL was chartering more than a dozen Vessels at the time and had no reason or desire to obtain an ownership stake in this Vessel or any other under its charter.

Additionally, the use of nominees to serve as officers of Empire is more a reflection of PAL's continuing agreement to manage the Vessel than it is a sign of any lack of a distinct corporate identity on the part of Empire. In fact, the Court heard testimony at trial that single-purpose corporations are a common liability tool employed for the sole purpose of obtaining ownership over a vessel. Accordingly, a corporation, like Empire, whose only function is conceded to be owner-

ship over a vessel, can be expected to have nominees serving as officers.[19] And the mere presence of nominee officers within Empire, given their use and acceptance within single-purpose corporations throughout the industry, counsels against this Court deeming Empire the alter-ego of PAL.

### F. *Empire was merely a facade*

Further addressing the *DeWitt* factors, the Rule B claimants argue that Empire was nothing more than a facade, its sole purpose being to serve Williams in an effort to extract Calais' investment in PAL. And although Empire maintained no corporate offices, had nominee officers, and did not immediately issue shares, the record as a whole does not support the conclusion that it was created and existed as an instrumentality of Williams whose sole purpose was to recover amounts loaned to PAL.

PAL initially chartered the Vessel from Santa Lucia back in September of 1994. Almost immediately the Vessel required repairs. In an effort to keep the Vessel at sea and maintain operations, PAL began to advance the expenses associated with repairs on behalf of Santa Lucia. According to Williams, Gallagher, and Alavi, it quickly became clear that Santa Lucia was not in a position to cover the mounting repair costs on the Vessel. By the middle of 1995, PAL had advanced approximately $1.7 million for various repairs and owner's expenses. Santa Lucia continued to evidence an inability to cover these costs and Gallagher, Alavi, and Williams concluded that the only way to recover the significant amounts already advanced and eventually repay Calais would be to sell the Vessel.[20]

To accomplish the sale, the parties engaged various brokers, but when all efforts failed to turn up a buyer the parties began to negotiate among themselves. The Bank and Roberto Leigh, owner of Santa Lucia, agreed to the terms of a sale and a Memorandum of Agreement ("MOA") was executed in June of 1995 providing that Santa Lucia would sell the Vessel to PAL or its nominee. When Roberto Leigh's efforts to find a buyer continued to fail and the deadline for the sale under the MOA drew near, Williams apparently convinced the Calais investors to purchase the Vessel.

Williams contacted Van Praag, then counsel for Santa Lucia, and requested that he organize Empire and complete the sale. The Calais investors' initial investment in Empire consisted of PAL's credit from Santa Lucia in the amount of $1.3 million for owner's expenses previously advanced to the Vessel. PAL transferred this credit to Empire in exchange for Calais' release on amounts owing from their initial $1.8 million loan. Empire also agreed to assume the outstanding mortgage in the amount of $5.5 million.

Although a somewhat unusual transaction from the outside, the persons most closely involved testified that Calais, through Empire, would be the sole owner of the Vessel. (Williams Tr. 192–197). Williams, Gallagher and Alavi all stated that it was everyone's understanding that PAL would continue to manage and operate the Vessel on behalf of Empire. (Williams Tr. 202)(Gallagher Tr. 51). Accordingly, even though PAL participated in the sale of the Vessel and the subsequent negotiations regarding Empire's schedule of payments with the bank, this participation was in their capacity as both the charterer and manager of the Vessel and evidences nothing beyond an eagerness to get this Vessel back to sea and start operating at a profit.

In light of this, the Court fails to find any substantive evidence that Empire was created as a ruse to extract Calais' original loan to PAL. As is common in the shipping industry for liability purposes, Empire was created to serve the sole function of owning a vessel. Williams testified that it was his belief the Vessel would be profitable once the mortgage

---

**19.** Indeed, the Court gleaned from testimony at trial that many enterprises provide nominee officers to single-purpose corporations as a profitable service.

**20.** Interestingly, but for the owner's expenses advanced on this Vessel, PAL would have been quite successful during their inaugural year of operations. Thus, it is easy to understand their interest in obtaining a solvent buyer for this Vessel.

terms were renegotiated with the Bank.[21] Empire made the first of the re-scheduled payments on the mortgage, but the Vessel immediately suffered another significant casualty. Empire made no further payments toward the Vessel and failed to appear in this action, apparently forfeiting any equity they might have acquired in the Vessel. These actions are not consistent with the theory that Empire was created for the sole purpose of extracting Calais' original investment in PAL. The Calais group only received equity in a Vessel, not capital through the transaction, and their subsequent failure to appear on the Vessel's behalf ultimately forfeited their investment.

### G. *Injustice and Fundamental Unfairness*

Finally, and perhaps most notably, the Rule B claimants have produced no evidence that PAL's relationship with Empire was fundamentally unfair or resulted in injustice. In their attempts to support such a claim, the Rule B claimants renew their argument that PAL's capital was completely stripped when the $1.3 million credit for advanced expenses was transferred to Empire. Additionally, the Rule B claimants argue that PAL deliberately misrepresented that it was the owner of the Vessel on several occasions, thus prejudicing its creditors.

This Court has already stated its belief that Calais' original investment into PAL was a loan pursuant to a floating line of credit and accordingly declines the invitation to revisit the issue here. However, for the purposes of emphasis, the Court reiterates its belief that even if Calais' investment were deemed to be capital, the removal of the credit for owner's expenses did not strip PAL of all working capital. Indeed, PAL continued to operate, contracting with both Rule B claimants in the matter at hand, months after the sale of the Vessel and transfer of the credit had been consummated.

Additionally, although there exists some evidence that agents of PAL represented that they owned the Vessel on several occasions, the record before this Court fails to establish that any such misrepresentations were made to the Rule B claimants who now contend they were prejudiced. As the Bank has correctly pointed out, the specific instances of misconduct cited by the Rule B claimants occurred well after both had entered into charter parties with PAL. Additionally, neither claimant produced a witness that had participated in the decision to charter a vessel to PAL and accordingly produced no evidence of a misrepresentation, direct or indirect, that they relied upon to their detriment when considering whether to contract with PAL. Accordingly, there is no evidence that any misrepresentations made by PAL were actually relied upon by these claimants as required by prior decisions of this Court, and thus, there is no support for the Rule B claimants' request to pierce the corporate veil. *See Puamier,* 395 F.Supp. at 1038; *Trexler,* 290 F.Supp. at 440.

Finally, with regard to any claim of fundamental unfairness, this Court notes that the present case is not in line with traditional alter-ego cases. In the vast majority of cases, a party is seeking to pierce the corporate veil of a subsidiary, with whom a party dealt, in an effort to impose liability upon a principal shareholder or parent corporation. In the present case, however, the Rule B claimants seek to pierce the veil of the alleged parent company, PAL, and impose liability not upon its shareholders, Alavi and Gallagher, but rather they seek to impose liability upon Empire, which they claim operated as a subsidiary of PAL and with whom they had no dealings.

In light of the foregoing absence of the traditional hallmarks of corporate irregularity, this Court declines the invitation to declare PAL and Empire corporate alter-egos and PAL the owner-in-fact of this Vessel. Accordingly, the Rule B claimants cannot properly share in the funds resulting from the Vessel's sale.

### V.

Notwithstanding this Court's holding that the evidence at trial was insufficient to estab-

---

21. He also testified that the Calais group had no intentions of contributing capital to Empire be-

yond the initial amount.

lish an alter-ego relationship between PAL and Empire, the validity of the Bank's foreign ship mortgage is addressed out of an abundance of caution. As previously stated, the Bank is entitled to priority with regard to the funds from the Vessel's sale if it holds a valid preferred foreign ship mortgage as defined in 46 U.S.C. § 31301(6)(B), that is enforceable under § 31325 and afforded priority by 46 U.S.C. § 31326(b).

The Rule B claimants focus argument on the 1992 Mortgage on the Vessel, but have decided to forego any challenge as to the execution or registration of the instrument. Instead, the rule B claimants challenge the underlying substantive validity of the mortgage by arguing that Van Praag, when preparing the document, mistakenly believed that Santa Lucia was obligated to the Bank under the Loan Agreement. Thus, the argument goes, Van Praag drafted the 1992 Mortgage without memorializing any obligation on the part of Santa Lucia to repay the amounts loaned.

The Rule B claimants begin their argument on this point by urging the Court to find that the existence, or lack thereof, of purported obligations established pursuant to the 1992 Mortgage is governed by New York law, as the situs of the document's creation and the work of a New York attorney. After contending that New York law applies to the substantive provisions of the Mortgage, the Rule B claimants engage in an aggressive attack on specific language contained in both the Mortgage and the accompanying Loan Agreement. Their conclusion is that under New York law the Mortgage contains no obligation on the part of Santa Lucia to repay amounts loaned and is therefore insufficient and unenforceable to secure any purported debt.

In addition to arguing that the Mortgage contains no direct obligation on the part of Santa Lucia, the Rule B claimants contend that neither the Mortgage nor the Loan Agreement evidences a guarantee on the part of Santa Lucia.[22] In support, they cite the fact that all the notes securing the CAF

loan were executed by Empresa, without ever obtaining Santa Lucia's endorsement. Additionally, the claimants point out that Santa Lucia failed to co-sign or endorse the Loan Agreement. Thus, they argue, even the extrinsic evidence surrounding the loan transaction demonstrates that the parties to the Mortgage and Loan Agreement did not intend to create any type of payment obligation on the part of Santa Lucia. And because a mortgage with no debt is void, the Rule B claimants argue that the Bank's mortgage in the present case is a complete nullity, without the possibility of being renovated or revived by subsequent amendments.

In response, the Bank argues that the 1992 Mortgage is governed by Liberian law and as such, contains adequate evidence of Santa Lucia's indebtedness to the Bank. They point to the fact that their expert witness, Dr. Wiswall, testified that the 1992 Mortgage contained a valid obligation on the part of Santa Lucia to repay the Bank. Alternatively, the Bank argues that any alleged inadequate description of the repayment obligation does not render the 1992 Mortgage void *ab initio*, rather it is rendered voidable. However, even a voidable mortgage can be ratified and the Bank argues that exactly this took place when the subsequent amendments to the original Mortgage and its accompanying guarantees and promissory notes were duly executed and recorded.

### VI.

■■ At the outset, all that is required for a foreign mortgage to be given preferred status under the Ship Mortgage Act, as amended in 1954, is proof of due execution and valid registration as required under foreign law. *See Mobile Marine Sales. Ltd.. R.S. v. M/V PRODROMOS*, 776 F.2d 85, 88 (3d Cir.1985)("the intention of the [Ship Mortgage Act] is to provide a simplified procedure for enforcing [foreign] mortgages"). A showing that the mortgage is valid under foreign substantive law is not a prerequisite to a mortgage obtaining preferred status. *Id.* Additionally, to the extent that the Rule

---

**22.** Indeed, the Rule B claimants even attempt to challenge Santa Lucia's power to ever execute    such a guarantee in favor of Empire.

B claimants challenge the underlying form and substance of the instrument itself,[23] they carry the burden of establishing invalidity under Liberian law.[24] *See Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland, plc,* 817 F.Supp. 1254, 1259 (E.D.Pa.), *aff'd,* 10 F.3d 176 (3d Cir.1993), *aff'd,* 10 F.3d 1015 (3d Cir.1993); *Tropicana Shippings. S.A. v. Empresa Nacional "Elcano" de la Marina Mercante,* 366 F.2d 729, 733 (5th Cir.1966). It is from this perspective that the Court begins its examination of the 1992 Mortgage's underlying validity.

■ As correctly stated by the court in *Tropicana Shippings,* "the validity of a mortgage is dependent only on the existence of a debt actually secured by the mortgage and *not* the description of the debt contained in the instrument." *Id.* at 733 (emphasis added). Additionally, when considering whether an underlying debt actually existed, a court can look to extrinsic evidence and parol testimony. *Id.* (citations omitted).

■ The evidence from trial established that the Rule B claimant's reliance upon somewhat ambiguous language from the loan documents betrays the character of the transaction and the parties' intent when executing both the Mortgage and the Loan Agreement. The sale of the Vessel was a somewhat confusing transaction involving CAF, the Bank, Empresa, and Santa Lucia that, at first glance, would confuse anyone reviewing the loan documents. Only after the nature of the transaction is understood do the loan documents become clearer. Simply stated, the arrangement was as follows: CAF loaned $5.0 million to the Bank by crediting its account, the Bank then loaned this amount to Empresa so that Empresa could acquire all the stock of Santa Lucia and accordingly, acquire the Vessel. Before releasing any funds, the Bank required substantial security from Empresa, Santa Lucia, and Roberto Leigh.

Specifically, Empresa executed a series of notes in favor of the Bank to cover the entire $5.0 million as it became due under the terms of the CAF loan. The Bank obtained a personal guarantee from Roberto Leigh. And finally, the Bank required that a mortgage on the Vessel be executed in their favor. It was the opinion of the only expert witness from trial, Dr. Wiswall, that this mortgage—the 1992 Mortgage—evidenced an obligation on the part of the shipowner, Santa Lucia, and this Court agrees.

Even if this Court were to disagree with Dr. Wiswall and find that the Mortgage was void of any direct repayment obligation on the part of the shipowner, the evidence establishes conclusively that the Bank required, and Empresa provided, a guarantee on the funds from the Vessel's owner[25] Empresa was the single stockholder in Santa Lucia and both were controlled by Roberto Leigh.[26] And although not the registered owner of the Vessel, Empresa certainly had the power to, and did, provide the Bank with Santa Lucia's guarantee.

Additionally, any argument that such a guarantee on the part of Santa Lucia is void for lack of shareholder action is without merit. Dr. Wiswall testified correctly that, as a Liberian corporation, Santa Lucia can execute a guarantee on behalf of Empresa, without any stockholder action, if it was given "in furtherance of its corporate purposes." *See* Liberian Corporation Business Act § 2.2(g). This guarantee facilitated the purchase of a commercial shipping vessel for its sole stockholder, Empresa or Roberto Leigh, and accordingly was in the furtherance of its corporate purpose. As the Bank has pointed out,

---

23. That is, the document was insufficient to ever create a legal obligation and thus, cannot constitute a mortgage.

24. And to the extent it does not conflict with established Liberian law, authority may also come from federal maritime common law as established by the courts of the United States. *See* Liberian Maritime Law § 30 and Liberian General Construction Law § 40.

25. This is true whether the guarantee was specifically provided for in the Loan Agreement between Empresa and CAF or not.

26. It was not certain that Empresa actually acquired all of Santa Lucia's stock as anticipated by the CAF loan, or whether Roberto Leigh remained a stockholder Santa Lucia. Nonetheless, the evidence from trial established that Roberto Leigh had direct control over the operations of both.

even if the guarantee wasn't in furtherance of Santa Lucia's corporate purpose it was done with shareholder approval. The sole stockholder in Santa Lucia at the time was either Roberto Leigh or Empresa, both of which obviously agreed to the guarantee so that the Bank would release the loans proceeds and ownership of the Vessel could be transferred.

Finally, even if the 1992 Mortgage suffers from some deficiency in its description of Santa Lucia's payment obligation, it is well settled that such a deficiency merely rendered the mortgage voidable and not void *ab initio* as the Rule B claimants contend.

## VII.

Lastly, the Claimants argue that the Bank's mortgage, although entitled to priority by statute, should be equitably subordinated for unjust conduct. As examples of unjust conduct, the Rule B claimants cite all of the following: that the Bank was aware Santa Lucia could not pay mounting bills but refused to foreclose and even extended further credit; a special relationship existed between the Bank and Roberto Leigh that led to questionable practices; and ultimately, the fact that the Bank knew, or should have known, that Empire was a shell company and thus, participated in a form of fraud during the Vessel's sale to Empire. In essence, Claimants argue that the Bank facilitated the fraudulent conveyance of the Vessel when it loaned Empire $5.5 million to purchase the Vessel. It is this final argument of the Rule B claimants that this Court now considers.

## VIII.

■■■ "A showing that the [superior] claimant is in a position of control over the debtor" is the prerequisite to any attempt to subordinate a preferred maritime lien. *United States v. THE PRIDE OF TEXAS,* 1994 WL 913279 at *5 (Civil Action No. 2:92cv211) (E.D.Va.1994). Once the element of control is established, three additional conditions must be satisfied before a court is justified in equitably subordinating a superior claim. These are:

(1) the [superior] claimant must have engaged in some type of inequitable conduct;

(2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and

(3) the equitable subordination of the claim must no be inconsistent with applicable statutory provisions

*See Id.* at *4; *Hornbeck Offshore Operators. Inc. v. Ocean Line of Bermuda, Inc.,* 849 F.Supp. 434, 441 (E.D.Va.1994). After considering the Bank's conduct in the instant action in light of the foregoing, this Court declines any invitation to equitably subordinate their valid, preferred foreign ship mortgage.

### A. *Control Over the Debtor*

First, there is no evidence that the Bank ever exerted any degree of control over Empresa or Santa Lucia. To the contrary, the testimony from Mr. Miro–Quesada and Mr. Sangalli, both officers at the Bank, was that they would have preferred more control over Roberto Leigh and his companies. Indeed, in a revelation at trial, the officers from the Bank conceded that they didn't even have sufficient control over Empresa to insure that the purpose of the original CAF loan, the acquisition of a vessel, was accomplished. The Bank's lack of control over Empresa or Santa Lucia is further evidenced by its desire to obtain additional security from other Roberto Leigh companies they felt were less of a risk even though the estimates regarding the Vessel's worth exceeded the amounts loaned.

Even if some evidence of control or a special relationship between the bank and Roberto Leigh exists in the present case, the degree of control must be akin to that illustrated in *Custom Fuel Svcs. v. Lombas Indus.,* 805 F.2d 561, 566 (5th Cir.1986), before a court is justified in subordinating an otherwise preferred claim. The court in *Custom Fuel,* when discussing the relationship between a bank and its wholly-owned subsidiary, addressed whether a parent corporation could attempt to insulate its vessel from liens by transferring title to a subsidiary. In determining that this transaction was a sham and the bank's mortgage should be subordi-

nated, the court seized upon the fact that the nominal shipowner was a wholly owned subsidiary of the bank. Of particular importance on this point was the bank's ownership of the shipowner's stock, its control of the subsidiary's board of directors, and the number of employees shared among the two entities. *Id.* at 566. Indeed, the degree of control was so great that the court found that the "Bank *caused* the Subsidiary's directors to approve the 'purchase' of the vessel and grant the Bank a mortgage in return." *Id.* (emphasis added). This degree of control is nowhere to be found in the record from the present case.

### B. *Inequitable Conduct*

Additionally, the Rule B claimants have failed to establish sufficient evidence of any of the remaining requirements. The next requirement, that the Bank must have engaged in inequitable conduct, consists of "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter-ego." *Id.* at 566. There is no evidence that Bank had sufficient control over either PAL or Empire to employ them as an instrumentality or be considered "one in the same" with either. There is also no evidence that Empire was, or the Bank had reason to suspect they were, undercapitalized or otherwise unable to make payments on the loan. Indeed, all parties participated in negotiations leading to a new payment schedule that was intended to insure Empire's ability to remain current on the loan and operate at a profit.

The record is equally void of any evidence that the Bank loaned Empire $5.5 million to accomplish a fraudulent conveyance. The Bank desperately sought a solvent purchaser for the Vessel and when Empire emerged, the Bank took steps to insure that all was well with them. The fact that Empire was a single purpose corporation without a large initial investment does not render the Bank's participation suspect nor the transaction fraudulent. Indeed, single-purpose corporations are quite common as vessel owners, and Empire had approximately $2 million in equity in the Vessel given the appraisals of the ship's value at the time.

To suggest that the Bank was a willing participant in a fraud is to disregard the record from trial. The record clearly establishes that the Bank was initially wary of Empire and repeatedly requested information on its principals and directors. And only after some of this information was provided and certain assurances were made did they agree to the sale of the Vessel to Empire. Their actions were in no way an attempt to shield PAL, with whom the Bank had no prior dealings, from any of its past or future creditors.

### C. *Harm to Creditors*

The record from trial is also lacking of any evidence that the Rule B claimants in this action were prejudiced or harmed by any of the conduct complained of. Both Ost–West and Banchory dealt with PAL long after the sale of the Vessel had been completed. Empire was clearly the registered owner, thus neither party could have relied upon the creditworthiness of the Vessel when allowing PAL to charter their respective vessels. If PAL was undercapitalized after the sale, these claimants have no excuse for their own failure to realize as much before contracting with PAL. Additionally, to the extent the Rule B claimants argue that the Bank's failure to foreclose on the Vessel at an earlier date adversely impacted them, this also does not support subordination. *Se PRIDE OF TEXAS,* at *7.

### D. *Consistency with Applicable Statutes*

Finally, equitable subordination of a valid first preferred foreign ship mortgage is contrary to the specific terms of the Ship Mortgage Act, as amended. *See Id.* at *8 (noting that unlike the Bankruptcy Code, the Ship Mortgage Act has no statutory provisions providing for the subordination of claims). Accordingly, even if all of the foregoing requirements for subordination were satisfied, this Court could not violate the statutory mandate and subordinate the Bank's mortgage.

### IX.

As a final matter, one motion remained outstanding as of the date of trial. The issue has been completely briefed and argued by

both parties and has remained under advisement since late last year. The motion raises what this Court believes to be an issue of first impression, that is, whether Ost–West should receive *in custodia legis* proceeds for bunkers it had properly attached that were expended to preserve the Vessel while under arrest.

As stated above, Ost–West owns a vessel not involved in the present dispute, the *M/V TRUSKAVETS*, that had been, at some point prior, chartered to PAL. Seeking recovery of $250,000 from PAL for non-payment of charter hire and bunkers on the *M/V TRUSKA-VETS*, Ost–West attached the M/V PRIDE OF DONEGAL on February 28, 1996. On March 6, 1996, Empire Shipping, then the owner of the Vessel and in its only appearance in this matter, objected to Ost–West's attachment of the Vessel and filed a motion to quash. Counsel for Empire Shipping argued that PAL, the time charterer, had never owned the Vessel and had no interest as a charterer after February 21, 1996, when Empire terminated the time charter for non-payment. Additionally, Empire argued that the attached bunkers had been furnished by Plaza Fueling Agents ("Plaza Fuel") and that Empire acquired title to the bunkers when it settled with Plaza.

This Court indicated its agreement that Ost–West's attachment of the Vessel was not proper, and counsel for Ost–West withdrew its attachment of the Vessel on March 20, 1996. On March 21, 1996, this Court next heard argument regarding the propriety of Ost–West's attachment of the Vessel's bunkers and took the matter under advisement. By Order dated May 20, 1996, this Court held that Empire did not acquire title to the bunkers through their settlement with Plaza Fuel. This Court held that the settlement with Plaza Fuel was an attempt to set aside the attachment of the Vessel, not to gain title to the bunkers. Accordingly, Ost–West was allowed to retain its attachment of the Vessel's bunkers, valued at approximately $26,-000.

Ost–West filed the motion presently before the Court claiming that PAL is entitled to *custodia legis* status as a supplier of the Vessel with regard to the bunkers and insofar as PAL failed to appear in this matter, Ost–West is entitled to have the value of the attached bunkers paid out of the proceeds from the Vessel's sale.

■ The general rule is that no liens may accrue against a vessel once she has been attached or arrested. An exception, arising out of equitable province of the court, applies to any service furnished to a vessel, while in the court's custody, that contributes to the preservation or creation of fund from the vessel's sale. *See Transamerica Commercial Finance v. F/V Smilelee*, 944 F.2d 186, 189 (4th Cir.1991) (citing *New York Dock v. S/S Poznan*, 274 U.S. 117, 122–23, 47 S.Ct. 482, 484–85, 71 L.Ed. 955 (1927)).

■ Neither the Bank nor Ost–West has directed this Court's attention toward any authority that squarely deals with the narrow issue presented by this dispute; that is, whether Ost–West, by virtue of its attaching bunkers—not owned by Empire—that were burned to preserve the Vessel, "furnished" the Vessel with a necessary service within the doctrine of *in custodia legis* expenses.

In the interests of equity and in keeping with the plain meaning of the word, this Court finds that Ost–West did "furnish" the Vessel with fuel and is entitled to be paid $26,000 from the sale proceeds of the Vessel. Simply stated, to furnish means to provide or supply with what is needed, useful or desirable, *Webster's Third New International Dictionary* 923–24 (1968), and Ost–West did just that.

Up until the time the bunkers were used to preserve and maintain the Vessel, they served as security for Ost–West's *in personam* claim under Rule B of the Supplemental Rules of Admiralty. Rule B does nothing more than provide a claimant an avenue to pursue a claim unrelated to the attached property. The attachment of the property is to insure both the owners' appearance and if they fail to appear, the satisfaction of a potential judgment. *See* William Tetley, *Maritime Liens and Claims* 433 (1989).

In the present case, this Court previously decided that Empire did not hold title to the bunkers so they were the proper subject of attachment in the attempt to secure PAL's

appearance in the matter. However, as evidenced by their failure to appear at any stage of these proceedings, the attachment of the bunkers was not sufficient to secure PAL's appearance. And, as a result of the Vessel's arrest, the attached bunkers were ultimately consumed. Thus, Ost–West's attachment also was not successful in securing a res to satisfy a potential claim.

Accordingly, inasmuch as Empire, the party the Bank holds a claim against, did not hold title to the bunkers, this Court invokes its equitable powers and holds that the burning of Ost–West's attached bunkers furnished the Vessel with a service. And this service, that preserved the Vessel's value, is therefore to be considered *in custodia legis* and entitled to share in the proceeds from the Vessel's sale to the extent of $26,000, the reasonable value of the attached bunkers. To hold otherwise would allow the Bank unjust enrichment.

### X.

For the reasons set forth above, this Court finds that the remaining Rule C claimant, Banco Wiese Limitado, has a valid Liberian ship mortgage. This maritime lien against the Vessel, and ultimately the sale proceeds, is preferred under the applicable provisions of the Ship Mortgage Act and is entitled to priority over both the remaining Rule B claimants.

Additionally, in light of the evidence at trial, the Bank is entitled to a judgment against Empire Shipping, S.A. in the amount of $6,977,034.93 plus interest accruing since March 17, 1997 as provided in the promissory note dated September 20, 1995, executed by Empire.

**IT IS SO ORDERED.**